Ricky WYATT, By and Through his aunt and legal guardian, Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,

Diane Martin, et al., Plaintiff–Intervenors,

v.

R. Emmett POUNDSTONE, III, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,

United States of America, Amicus Curiae.

Civ. A. No. 3195–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 11, 1995.

Fern Singer, Watterson & Singer, Birmingham, AL, James A. Tucker, ACLU of Alabama, Montgomery, AL, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Claudia Schlosberg, Ellen Harris, Mary Giliberti, Bazelon Center for Mental Health Law, Washington, DC, James M. Lichtman, Ropes & Gray, Washington, DC, and Kathryn H. Sumrall, Jackson, Garrison & Sumrall, P.C., Birmingham, AL, for plaintiffs.

David Ferleger, Philadelphia, PA, and Drew P. Baker, Reuben Wright Cook, and Victoria Ann Farr, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, for intervenors-plaintiffs.

Mary Elizabeth Culberson, Office of the Atty. Gen., Montgomery, AL, Gregory Dale Crosslin, Robert E. Sasser, James Darrington Hamlett, Clifton E. Slaten, Charles Brinsfield Campbell, Patrick C. Davidson, Sasser & Littleton, P.C., Montgomery, AL, June O. Lynn, G.R. (Rick) Trawick, Milton J. Westry, Dept. of Mental Health & Mental Retardation, Montgomery, AL, and Ricky J. McKinney, Watson, Harrison & deGraffenried, Tuscaloosa, AL, for defendants.

Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, and Deval L. Patrick, Robinsue Frohboese, Judith C. Preston, and Tawana E. Davis, U.S. Dept. of Justice, Civ. Rights Div., Special Litigation Section, Washington, DC, for the U.S., amicus curiae.

## MEMORANDUM OPINION

### MYRON H. THOMPSON, Chief Judge.

The plaintiffs in this ongoing class-action lawsuit first sued officials of the State of Alabama over 24-years ago, claiming that conditions at facilities operated by the Alabama Department of Mental Health and Mental Retardation violated residents' rights under federal law. On January 22, 1993, the plaintiffs moved to enforce a 1986 consent decree and for further relief, claiming that defendant state officials had failed to comply with the 1986 decree and were violating the recently enacted Americans with Disabilities Act of 1990, 42 U.S.C.A. §§ 12101–12213 (West Supp.1995).

Now before the court is an additional motion by the plaintiffs seeking preliminary injunctive relief on their 1993 motion as to one of the state-operated mental health facilities, the Eufaula Adolescent Center.[1] For the reasons that follow, the court concludes that the additional motion should be granted and a preliminary injunction entered.

## I. PROCEDURAL BACKGROUND

In 1972, after finding that the defendants were violating the plaintiffs' constitutional rights, the court entered injunctions requiring that state facilities for the mentally retarded and mentally ill be brought into compliance with certain minimal standards.

*Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala. 1972) (Johnson, J.) (standards for mentally ill), *aff'd in relevant part,* 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney,* 344 F.Supp. 387 (M.D.Ala.1972) (Johnson, J.) (standards for mentally retarded), *aff'd in relevant part,* 503 F.2d 1305 (5th Cir.1974). These standards were developed with the assistance of the parties and experts in the fields of mental health and mental retardation, and are commonly known as the "*Wyatt* standards."[2] The establishment of the *Wyatt* standards proved, however, to be only the first step in an extended struggle to secure the rights of the mentally ill and mentally retarded residents of Alabama's institutions. In 1986, the court approved a consent decree resolving the parties' continued conflicts over the adequacy of the state's funding and administration of the state's mental health and retardation facilities.[3] As part of the 1986 consent decree, the defendants agreed to make substantial progress towards achieving compliance with the *Wyatt* standards.[4]

In 1991, a new round of litigation began. On January 18, 1991, the defendants moved for a finding that they had met their obligations under the 1986 decree and for an order terminating this lawsuit. On January 22, 1993, as stated, the plaintiffs moved to enforce the 1986 consent decree and for further relief, claiming that the defendants had failed to comply with the decree and were violating the recently enacted Americans with Disabilities Act. Beginning on March 13, 1995, the court held a 35-day hearing on these two motions.

At the beginning of the hearing, based on the pretrial briefs and a preliminary review of the evidentiary record filed prior to the hearing,[5] the court expressed grave concern

---

1. Doc. no. 901.

2. Modifications to the court-ordered standards have been approved. *See, e.g., Wyatt v. King,* 793 F.Supp. 1058 (M.D.Ala.1992) (Thompson, J.).

3. The consent decree is reproduced at *Wyatt v. Wallis,* No. 3195–N, 1986 WL 69194 (M.D.Ala. Sept. 22, 1986) (Thompson, J.).

4. *Id.* at *2–3, *7 ¶ 7.

5. The hearing was, by agreement of the parties, a "summary" proceeding. To try this case as a normal trial would have taken many months and the parties therefore agreed to try it as a sum-

mary proceeding. As a summary proceeding, the evidence was submitted in a jointly prepared record before the hearing, and both the defendants' and the plaintiffs' live and in-court examination of witnesses was limited to 60 hours of direct and 30 hours of cross, with rebuttal testimony limited to two days. The purpose of a live hearing was to highlight the most pertinent and relevant parts of the already filed record. *See Wyatt v. Poundstone,* No. 3195 (M.D.Ala. May 8, 1995); *Wyatt v. Hanan,* No. 3195 (M.D.Ala. Dec. 30, 1994); *id.* (M.D.Ala. Nov. 9, 1994); *id.* (M.D.Ala. Sept. 26, 1994).

about violations of the *Wyatt* standards at the Eufaula Adolescent Center, a facility for adolescent children.[6] The briefs and the record indicated that there were pervasive and severe safety problems and abuse of resident children at the Center, in violation of *Wyatt* mental-illness standards 1, 7, and 19. These standards, as the court will explain later, require that the defendants maintain a safe environment for residents in its mental-illness institutions. After presenting their evidence on the Eufaula Adolescent Center, the plaintiffs filed a motion requesting preliminary injunctive relief as to these safety problems.

Although the court has heard all of the evidence, it is treating this motion as one for preliminary, as opposed to final, relief. The relief is preliminary in the sense that final briefs are not due until mid-July 1995, and the court will not have a chance to review the mammoth record as a whole for some time thereafter. However, because, as is shown below, violations of the *Wyatt* standards at the Center are pervasive and severe and because, as a result, the very health and safety of the children at the Center are threatened, some form of preliminary or interim relief is warranted. The need for final and long-term relief, as well as the need for other relief regarding alleged additional violations of the 1986 consent decree and the Americans with Disabilities Act, will remain an open issue and will be addressed as part of the final disposition of this round of litigation.

## II. STANDARD FOR PRELIMINARY INJUNCTION

■ Whether to issue a preliminary injunction lies within the sound discretion of the district court. *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir.1990). The Eleventh Circuit Court of Appeals has established a four-prong test for the district court to apply when determining whether a preliminary injunction should issue. Under this test, the movant must demonstrate: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the threatened harm the injunction may do to the opposing party; and (4) granting the preliminary injunction will not be adverse to the public interest. *Id.; United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983); *see also* Fed.R.Civ.P. 65. In the following two sections of this memorandum opinion, the court will, first, preliminarily find the facts and, second, explain why, based on an application of the above four-prong test to these facts, some limited preliminary relief is warranted.

## III. PRELIMINARY FINDINGS OF FACT

### A. History of Eufaula Adolescent Center

#### 1. The Place

The Eufaula Adolescent Center is a secure, residential treatment facility located in a remote and rural part of Barbour County, Alabama.[7] Formerly a military base, it is comprised of several buildings—two dorms, a recreational and gym area, a school, an administration building with professional offices, and a security building. The area is surrounded by a chain link fence.[8] The physical plant of the children's dorms—old military style barracks—is "Spartan" and outdated.[9] Furthermore, its remote location makes it difficult for families to visit their children and participate in therapy, and difficult to recruit qualified staff.[10]

#### 2. Its Mission

Although envisioned as a facility for treatment of mentally-ill adolescents in a secure environment, the Eufaula Adolescent Center evolved in the 1980s into a "penal" facility for "antisocial adolescent, conduct disorder patients who get in trouble with the law, and are sent to a secure psychiatric facility as a

---

6. Transcript of March 13, 1995, at 31, filed March 14, 1995.

7. The Center is one of many facilities operated by the defendants and subject to the 1986 consent decree. *Wyatt*, 793 F.Supp. at 1063, 1071; *Wyatt v. Hardin*, No. 3195 (M.D.Ala. Feb. 28, 1975).

8. Defendants' expert exh. 1: Gualtieri report at 54.

9. *Id.* at 55.

10. *See, e.g.*, plaintiffs' exh. I.B. 1(9): White report at 34 n. 48.

less restrictive alternative to incarceration."[11] "The fact that the [Center] was a secure facility represented a convenient resource for commitment by probate judges or juvenile judges who were faced with the problems of delinquent youth. The alternatives were the [Center] or a training school."[12] The Center was essentially a "correctional facility" with a "penal atmosphere."[13] Its program was "punitive" and "not nearly so therapeutic as it might have been."[14] "There was an excessive reliance on seclusion, a large number of patient injuries, allegations of staff abuse, programming that was overly restrictive and punitive in nature."[15] Therefore, the Center's mission was, to speak kindly, confusing: in theory, it was a treatment facility; but, in reality, it was essentially a penal institution.

This evolution into a penal facility violated the 1986 consent decree—including mental-illness standards 1, 7, and 19—in a number of serious and flagrant ways. First and most obviously, resident children were denied court-mandated treatment and were subjected to abuse both physically and mentally. Second, the defendants abandoned any effort to seek accreditation by the Joint Commission on Accreditation of Hospital Organizations (JCAHO). The 1986 decree required that the defendants make substantial efforts to achieve JCAHO accreditation at all its psychiatric facilities. JCAHO is an independent organization of health care professionals which promulgates national standards for health care facilities. In order to become accredited, a team of doctors, nurses, and administrators conducts an on-site survey at least every three years.[16] In October of 1987, the defendants unilaterally chose, instead, to pursue and obtain accreditation by the American Association of Psychiatric Services for Children (AAPSC).[17] AAPSC accreditation required "very little expense or changes in current operation."[18] Because the defendants' action was without court approval, it can be characterized only as a flagrant violation of the 1986 consent decree.[19]

Third, in 1990, the Wyatt Committee—an entity created under the terms of the 1986 consent decree to both monitor the defendants' progress and to advise the defendants—toured the Center.[20] The Committee found numerous serious violations of the 1986 consent decree and reported back to the court.[21] The most disturbing was that most of the children did not belong in the Center's restrictive environment.[22] In May 1990, the Committee and the defendants entered into

11. Defendants' expert exh. 1: Gualtieri report at 51.

12. *Id.* at 52.

13. *Id.*

14. *Id.* at 52–53.

15. *Id.* at 52.

16. Defendants' general exh. 36: Understanding the Hospital Performance Report.

17. Defendants' general exh. 338: memorandum, dated October 9, 1987, from Dykes to Pouncy; *id.:* memorandum, dated October 19, 1988, from Dykes to Pouncy.

18. *Id.:* memorandum, dated October 9, 1987, from Dykes to Pouncy. In any event, the less demanding AAPSC found serious problems at the Center. The AAPSC noted, among other problems, that the Center "lacks a clear philosophy of treatment," that its use of seclusion violated its own policies, that there was a need for training in dealing with suicidal behavior, and that gangs were a problem. Plaintiffs' exh. IV.C. 2(3) at 002611–12: AAPSC report of accreditation re-

view and recommendations, based on May 1992 site visits.

19. The defendants contend that they did not pursue accreditation because of their confusion over which of several manuals JCAHO would use to survey the facility. Transcript of April 12, 1995, at 3900–02, filed April 13, 1995. They also contend they were uncertain whether the Center would be kept open. *Id.* at 3901–02. These concerns, however, do not justify a five- or six-year delay, and they do not explain at all the defendants' failure to seek court approval for delay.

20. *See Wyatt v. Horsley,* No. 3195–N at 3–4 (M.D.Ala. Jan. 28, 1991) (describing role of Wyatt Committee).

21. Plaintiffs' exh. II.E. (101): letter to Commissioner from court, dated May 22, 1990. In 1991, the Wyatt Committee filed a formal report regarding the problems it found at the Center. Plaintiffs' exh. I.A. 5(3): Wyatt Consultant Committee's March 19, 1991 Report to the Court at 6–7.

22. *Id.* at 6.

an agreement to end placements at the Center. The court acknowledged this agreement in a letter to the Commissioner of Mental Health and Mental Retardation, stating that "there appears to be a general agreement between the department and the [Wyatt Committee] that the vast majority of the 115 children residing at the Eufaula facility are not in need of the type of restrictive and isolated environment Eufaula currently provides, and that these children could be more appropriately served in less restrictive, community-based programs, closer to their homes and families." [23] The court stated that it was agreed "that the department should develop, by no later than mid-August 1990, a detailed plan for providing both a conceptual framework for children's mental health services and an operational plan to develop needed community-based services and *to end placements at Eufaula.*" [24] However, the defendants did not comply with this agreement.[25]

In approving the 1986 consent decree, this court wrote that "there has been in this lawsuit a trail of broken promises of when there would be full compliance with the standards and orders of this court." *Wyatt v. Wallis,* No. 3195–N, 1986 WL 69194, *6 (M.D.Ala. Sept. 22, 1986) (Thompson, J.). The defendants' actions and lack of action

after the 1986 decree reflect that the court's admonishment was not heeded, and that the trail continued into the next decade. After two decades, it is therefore evident that the defendants do not always follow through on a promise, and that a court decree, absent close and direct oversight, carries with it no assurance of compliance.

Admittedly, beginning in the early 1990s, the defendants attempted to improve conditions at the Center. First, it commissioned a consultant committee, known as the Vaughan Committee, to review the Center and make recommendations. The Vaughan Committee developed a new mission statement regarding admissions, programming, staff training, and other aspects of the Center's program, moving the Center back toward treatment and away from its penal dimension.[26] As a result of these efforts at reform, the Center has been downsized from around 115 beds at its peak to a 60–bed capacity, which is evenly divided between boys and girls ages 12 to 18, and children admitted to the Center must have either a serious emotional disturbance or mental illness.[27] The most egregious exclusion practice, which resembled solitary confinement in a prison more than therapeutic exclusion in a psychiatric facility, has ended.[28] Moreover, the Center has now been accredited by JCAHO.[29] However, it

23. Plaintiffs' exh. II.E. 101: letter to Commissioner from court, dated May 22, 1990.

24. *Id.* (emphasis added).

25. Plaintiffs' exh. I.C. 4(21) at 107: deposition of Poundstone.

26. Plaintiffs' exh. IV.C. 2(6): final Vaughan report; plaintiffs' exh. IV.C. 2(13): implementation plan, dated October 8, 1992.

27. Defendants' general exh. 429: Vaughan affidavit; plaintiffs' exh. IV.C. 2(6): final Vaughan report at 002423–24; *see also* plaintiffs' exh. IV.C. 2(7): draft of Vaughan report.

28. The most egregious exclusion practice consisted of confinement in building 112. Building 112 consisted of a long narrow corridor with cells approximately nine-by-six. Each cell had a steel grate on the top with a light fixture hanging down through the grate. Other than the light, there were no fixtures or furniture, the building was unheated, and children had to sit on the concrete floor. Plaintiffs' exh. I.B. 1(9): White report at 21–22. Confinement in building 112

ended only in the wake of discovery at the Center.

The court further notes that despite the termination of confinements in building 112, it has some concerns regarding current exclusion practices at the Center. B-mod is a locked ward with rooms that have no doors. Children sent to B-mod are confined to their room and may not leave. A staff person sits at or near the door to ensure the child does not leave the room. The defendants contend this is not exclusion because there is no door, and therefore refers to this type confinement as merely "time-out". No time limits or clinical oversight is exercised on B-mod exclusions in clear violation of the Wyatt standards. *Id.* at 20; transcript of April 14, 1995, at 4417–19, 4431–39, filed April 17, 1995. Indeed, the Center's clinical director acknowledged that some children have been excluded in B-mod for up to five days. Plaintiffs' exh. I.C. 4(3) at 152–53, 158: Darnell deposition; *see also* transcript of April 13, 1995, at 4251, filed April 14, 1995 (testimony of Diane H.); *id.* at 4194–95 (testimony of Wayne T.).

29. *Wyatt v. Poundstone,* No. 3195, 1995 WL 569121 (M.D.Ala. April 17, 1995).

cannot be overlooked that the Vaughan Committee's report and implementation plan did not focus on the needed community-based services intended to end placements at Eufaula, as promised by the defendants, and that it was not until 1991 and 1992, some four or five years after the 1986 decree, that the defendants began taking the steps necessary to upgrade the substandard conditions at the Center to meet JCAHO accreditation requirements.[30]

Moreover, the evidence reflects that several of the Center's severe and pervasive problems from the 1980s and the early 1990s still remain. To be sure, the Center, because of its nature, will always have somewhat of a dual personality: on the one hand, the Center is a mental-illness facility and, as such, must provide treatment to its residents; and, on the other hand, because its residents also suffer from conduct disorders, it must also provide a "secure environment." The critical question, however, is whether, in spite of these recent improvements, the facility is still unnecessarily "penal" in nature, in violation of the *Wyatt* standards, and not sufficiently therapeutic, safe, and free from abuse. The court finds, as is shown below, that the defendants have failed to correct adequately the safety and abuse problems at the Center.

### B. Violations of Wyatt Safety and Abuse Standards

As stated, children at the Eufaula Adolescent Center are unnecessarily subjected to abuse and unsafe conditions, and they do not feel safe.[31] This danger is reflected in three particular areas: (1) gang activity; (2) staff abuse of children; and (3) the use of improper restraint techniques.

#### 1. Gang Activity

Gang activity is current and widespread at the Center. Many children credibly attested: "There are gangs here [at the Center]. They hit and kick and beat up on kids."[32] "The gangs are known to jump on kids they don't like and to hit and punch kids that are not members of their gang."[33] Gang members are sent on "missions" where they "get higher ranks for beating other people up."[34] Or the mission may involve "males mak[ing] the female do sex acts with them."[35]

The gangs create fear in the children at the Center. As one child attested, "The gangs scare me … I feel threatened for my physical safety here. This is not a safe place for kids to be."[36] And children will join gangs in order to feel safer and avoid being beat up. As one child stated, "I joined a gang because I kept getting hit and I thought once I joined people would leave me alone."[37] In order to identify with a gang, a child may tattoo himself or herself with a gang symbol.[38]

The gang activity is not only current and widespread, it has been longstanding and within the defendants' knowledge for some time. Dr. Buzogany, a member of the Vaughan Committee, testified that he and the Department of Mental Health and Mental Retardation were aware that gang activity existed at the Center.[39] Additionally, AAPSC noted in its report of accreditation review and recommendations that the Center itself had reported that it had continuing problems with gangs.[40]

---

30. *Id.*

31. Plaintiffs' exh. I.B. 1(9): White report at 3.

32. Plaintiffs' additional submission concerning the Center, filed May 10, 1995 (Doc. no. 1013), at exh. 1; *see also id.* at exhs. 2–8; plaintiffs' additional submission concerning gang activity, etc., filed May 1, 1995 (Doc. no. 942), at exhs. 1–22. The plaintiffs submitted 30 affidavits in total from children at the Center describing gang activity.

33. Plaintiffs' additional submission concerning gang activity, etc., filed May 1, 1995 (Doc. no. 942), at exh. 4.

34. *Id.* at exh. 1.

35. *Id.* at exh. 10; *see also id.* at exh. 22; transcript of April 13, 1995, at 4242–43, filed April 14, 1995 (testimony of Diane H.).

36. Plaintiffs' additional submission concerning gang activity, etc., filed May 1, 1995 (Doc. no. 942), at exh. 6; *see also id.* at exhs. 1, 3, and 5.

37. *Id.* at exh. 8.

38. Transcript of April 13, 1995, at 4243–44, filed April 14, 1995 (testimony of Diane H.); *id.* at 4188–89 (testimony of Wayne T.).

39. Plaintiffs' exh. I.C. 3(12) at 80: Deposition of Buzogany.

40. Plaintiffs' exh. IV.C. 2(3) at 002612 ("The agency itself reports a problem with gangs in the

The defendants have failed to address adequately the gang activity at the Center. Other than telling children to throw away gang signs or not wear gang colors, little else is done to eliminate gang activity.[41] Thus, children do not feel safe and do not feel as though they have any recourse. As one child stated, "I don't believe any of the staff put much effort into trying to stop the gangs here."[42] And another expressed similar frustrations: "The staffs know there are gangs here and that there is gang violence here but they do nothing about it except tell us we cannot wear [gang] 'colors.' They know a lot of the fights that happen here are because of the gangs but they still don't do anything to try to stop the gangs. They just act like the gangs do not exist, but they do. It is not a safe place here."[43] The court is convinced that gang activity is serious and pervasive at the Center and poses a direct and continuing threat to the safety of the children there.

The defendants' reaction at the hearing before the court to the evidence of gang activity is also informative. The defendants accused counsel for the plaintiffs of headline seeking and sensationalism for raising gang activities as a safety violation at the Center. And without even conducting a serious investigation of the allegations, they denied that gang activity constituted a problem at the Center.[44] Only after the court had openly questioned whether the defendants' denial-without-investigation was indicative of how they typically reacted to problems at the Center, did the defendants conduct a serious inquiry into gang activity at the Center.[45] The court admonished the defendants that it was deeply disappointed that, rather than blanketly denying the allegations without their own investigation, they had not stood up and promised a personal and thorough investigation of their own and that, if the allegations proved true, there was nothing within reason the court could order that they

facility. It is recommended that added training be given to staff about the management and handling of gangs").

41. Plaintiffs' additional submission concerning gang activity, filed May 1, 1995 (Doc. no. 942), at exhs. 4 and 7. According to one child's affidavit, the staff told children that all gang members would be sent to a Department of Youth Services facility and, as a result, many children began to deny that they were in gangs. This approach merely served to drive gang activity underground; it was not an effective way of addressing and eliminating gang influences and behaviors. *Id.* at exh. 17.

42. *Id.* at exh. 1.

43. *Id.* at exh. 4. The Center's advocate for children appears to be ineffective in addressing the children's concerns and fear of gangs. *Id.* at exhs. 1, 3, and 18. As one child reported, "Since it doesn't do any good to tell him [the advocate,] no one really goes to him very much." *Id.* at exh. 18.

44. Transcript of April 14, 1995, at 4465, 4468–70, filed April 17, 1995.

45. After the court's admonishment, the defendants hired a team of four experts to conduct a tour of the Center. Dr. Galloway, who testified on behalf of this team, stated that, although there was informal group activity that the children perceived as gang activity, there was no formal and organized gang activity. He observed infor-

mal group activity, such as gang markings, and noted that some children said they were in gangs, but he did not consider this to constitute a "gang" problem. Transcript of May 16, 1995, at 8050–52, filed May 17, 1995. Whether one refers to gang activities as formal and organized or informal group activity, the evidence reflects that the children at the Center engage in damaging rituals and threatening behavior seriously jeopardizing the safety of other children.

The findings of Galloway and his team regarding gang activity are also compromised by several factors. The first compromising factor is the extremely narrow focus of Galloway's investigation. He limited his inquiry to the observations made in the four days he and the team were at the Center. Transcript of May 15, 1995, at 7987–91, filed May 16, 1995. Thus, prior incidents were ignored. Second, he did not examine virtually any hard data—for example, incident reports or the like. *Id.* at 7985–86. And third, despite the fact that he was at the Center to examine gang activity, he did not investigate in any fashion the fact that two of the three clinical records he examined while at the Center had references, either in progress notes or behavioral reports, to gang activities. Transcript of May 16, 1995, at 8063–78, filed May 17, 1995. For example, in one record the therapist noted that in a session with the patient he or she "focused on [the patient's] gang involvement." *Id.* at 8063. While this could have referred to prior gang involvement, there is no way of knowing if it referred to current or prior gang involvement without making further inquiry.

would not have already done on their own to remedy the problem effectively.

The evidence of pervasive and serious gang activity at the Center and the defendants' reaction to the evidence leads the court to three important inferences. First, the defendants' tolerance of the destructive activity is indicative of the fact that they view the activity as natural to the facility and not worthy of any remedial effort, and of the further fact that they thus still view the Center as substantially penal rather then therapeutic in nature. Second, unless serious problems are brought out into the open before the court and public, it is likely that the defendants will not address them. And third, absent direct and continuing judicial oversight, it is likely that the defendants will not remedy a serious problem, even once brought out into the open; they will often deny it without adequate inquiry.

### 2. Staff Abuse

The administration at Eufaula Adolescent Center does not respond appropriately to evidence and allegations of staff abuse of children. Indeed, the evidence supports the conclusion that the Center, through inaction as well as action, has condoned and allowed continued abuse of children. The Center has a large number of abuse and neglect allegations, with an excessive number of children and staff being involved in multiple incidents of abuse and neglect.[46] During the period from November 1990 to August 1993, 42 staff members at the Center were involved in multiple abuse and neglect investigations, representing a total of 240 incidents.[47] Five of the Center staff were involved in eleven or more abuse and neglect incidents each.[48] These numbers indicate that appropriate action is not taken to insure staff do not abuse their positions of control and authority over children, who, of course, are naturally vulnerable.

Several examples are illustrative of this problem. Mr. M. was involved in 13 different investigations from September 1992 to January 1993. Shortly after beginning work, he physically abused a child by pushing him against a wall and injuring his head.[49] The only remedial action taken was verbal counseling and a one-day suspension without pay.[50] Additional complaints were filed against Mr. M. and investigated, six for physical abuse and two for verbal abuse. The Center found insufficient evidence to determine whether there had been actual physical abuse in the six physical abuse complaints; and the Center found that two instances of verbal abuse had occurred.[51] During one of the verbal abuse incidents, Mr. M. teased and taunted a child, making inappropriate and unprofessional comments concerning a child's mother.[52] In the other instance, Mr. M. called a boy a "white cracker," a "pecker head," and a "4-eyed bitch," and told the boy, "suck my dick."[53] For the verbal abuse, the Center sent a reprimand letter for one instance and issued a verbal warning for the other. The Center allowed Mr. M. to continue working with children after a substantiated instance and multiple allegations of physical abuse and instances of verbal abuse, potentially placing children in danger and certainly not providing appropriate care. Not until March 1993 did the Center terminate him.

Another staff member, a mental health worker, had sexual relationships with a child at the Center. The Department's Bureau of Special Investigations found evidence "sufficient to establish reason to believe and prob-

---

**46.** Plaintiffs' exh. I.B. 1(9): White report at 5–8; Plaintiffs' exhs. IV.C. 2(20) and IV.C. 2(31–32).

**47.** Plaintiffs' exh. I.B. 1(9): White report at 7; plaintiffs' exhs. IV.C. 2(31–32).

**48.** *Id.*

**49.** Plaintiffs' exh. IV.C. 4(5)(d) at 001315–16.

**50.** *Id.*

**51.** The physical abuse allegations included slamming a boy into a gym door, throwing a boy against a security screen and rubbing his face against the window, throwing a boy against his bed, purposefully scraping a boy's elbow against a wall, pushing a boy against a wall and verbally threatening him, and throwing a boy against a wall and twisting his arm behind his back in a choke hold. Additional allegations included allowing one boy to beat up another and asking a boy to tattoo him. Plaintiffs' exh. IV.C. 4(5)(d) at 001316–17.

**52.** *Id.* at 001316.

**53.** *Id.*

able cause to believe" that Mr. H. engaged in sexual intercourse with a 15–year–old girl in a bathroom stall.[54] Prior to this incident, Mr. H. had been investigated regarding five other incidents of physical abuse and sexual misconduct at the Center. In fact, Mr. H. had allegedly engaged in "digital intercourse" with the same woman on August 9, 1993. A staff member reported this incident to the director of the Center on August 18, but he failed to act or limit Mr. H.'s contact with children despite Mr. H.'s previous extensive record of sexual misconduct and the fact that the report mentioned that Mr. H. and this girl were planning to have intercourse in the bathroom.[55]

The Center's director learned of the alleged sexual intercourse in August 1993. In early September, he interviewed the victim and a second child who witnessed the sexual act, and he initiated an investigation by the Bureau of Special Investigation. The director, however, took no personnel action against Mr. H. until October 30, when he reassigned Mr. H. to the boys' dorm, and, on November 5, when he placed Mr. H. on mandatory annual leave. One week later, he allowed Mr. H. to resign. During the interim, before he reassigned Mr. H. to the boys' dorm and then placed him on leave, a resident reported that the alleged victim had been skipping classes to have sex with Mr. H.; the mother of a former resident called to report that her daughter had received letters from Mr. H. with inappropriate sexual language; and a staff member reported that Mr. H. was on the telephone with another girl arranging to meet her in the bathroom.[56] Thus, the Center allowed a staff member with a history of physical and sexual abuse to remain in contact with children while he was undergoing an investigation for the serious allegation of sexually abusing a child. The Center did not reassign Mr. H. to the boys' dorm until over two months after the alleged incident; and even this reassignment did not ensure he would have no contact with girls. This failure to act swiftly, firmly, and adequately, placed children in danger, by exposing them to a high risk of sexual and physical abuse. It also sent a message to the children and staff regarding the acceptability of the inappropriate sexual conduct at issue.

Equally disturbing is the defendants' failure to administer to the victim any follow-up counseling specifically designed to address this incident. Although her clinical record reflects that her therapists in individual and group sessions addressed this incident, it does not indicate that she received any special therapy or additional therapy after the incident was reported.[57] The court is further disturbed by the Center's failure to aid the victim in any manner in pursuing criminal charges.[58] Once the Center discharged her and she left the Center's gates, the Center absolved itself of all responsibility for this incident as far as the victim was concerned.

---

**54.** Plaintiffs' review of Benjamin H.'s personnel file, filed May 16, 1995 (Doc. no. 1035), at exh. 5 at 00004.

**55.** Plaintiffs' review of Benjamin H.'s personnel file, filed May 16, 1995 (Doc. no. 1035), at exh. 5a. Prior to this instance of sexual misconduct, a girl patient had reported that Mr. H. had asked her to pull up her shirt while in the gym and to go to the bathroom because he had something to show her. She also reported that Mr. H. winked at her and would bump into her and hit her with his hand on her bottom. The Center issued a letter of reprimand for this behavior. *Id.* at exh. 1. Additionally, a girl had alleged that Mr. H. had something going with two other girls, a boy had accused Mr. H. of being involved with a 15–year–old resident, and a boy admitted to assisting in the relay of a letter from a girl patient to Mr. H. During the investigation of the latter incident, one girl admitted that Mr. H. made sexual comments, touched her breasts, patted her butt,

and had asked her to have sex with him. The investigation file also indicated that another boy reported overhearing Mr. H. tell a girl patient he wanted to have intercourse with her. *Id.* at exhs. 2–4. Despite this record, Mr. H. still was in direct contact with children when he allegedly had sexual intercourse with a girl patient at the Center in a bathroom stall.

**56.** Plaintiffs' review of Benjamin H.'s file, filed May 16, 1995 (Doc. no. 1035), at exhs. 5b, 8, and 5c.

**57.** Notice of filing of client record (Doc. no. 924). Her progress notes indicate that this incident arose in therapy sessions on September 13, 21, and 28, 1993.

**58.** The incident involving Mr. H. having sexual intercourse with a girl patient in the bathroom was referred to a grand jury. However, the state did not pursue criminal charges because the girl did not appear at the grand jury hearing.

In summary, the court finds that the Center does not respond appropriately to serious instances of staff abuse. The court recognizes that, because of the type of residents it has, the Center will probably have more false allegations of abuse than other facilities do, and the court further recognizes that it is impossible to prevent abuse from ever occurring at an institution; nevertheless, the number of incidents of abuse at the Center is unacceptably high.

### 3. Use of Improper Force to Restrain Children

Staff improperly uses dangerous physical force to restrain children at the Center. These include: hammerlocks, bending a child's thumb back while holding the child in a hammerlock, placing forearms against a child's neck while the child is against a wall, and using knees in a child's back to pin the child on the ground.[59] Some of the children have sustained welts, scrapes, and bruises as a result of improper restraint practices.[60] The administration at the Center has not taken action to redress such abuse. Although the defendants report that one staff member who used improper force to restrain children has been fired,[61] this is only one staff member and does not address the institutional problem. This would require training staff to restrain children in a proper way, and not tolerating the failure to do so. The Center has a history of tolerating such abuse.[62] There are proper and safe methods for restraining even the most volatile individuals and these should be used. Failure to use proven and safe methods should not be tolerated and should be firmly addressed.

### C. JCAHO Accreditation and Center Policies

The defendants contend that the Center's recent accreditation by JCAHO demonstrates that it provides a safe environment for children. As explained earlier, JCAHO is an independent organization of health care professionals which promulgates national standards for health care facilities. JCAHO will inspect a hospital to determine if it complies with its standards. However, as demonstrated at trial, JCAHO accreditation does not mean that a facility is protecting a patients' constitutional and statutory rights to safety.[63] In fact, courts, which have examined this question, have found that JCAHO accreditation is "by no means an assurance that abuse and neglect of patients does not take place in an institution." *Robbins v. Budke*, 739 F.Supp. 1479, 1481 (D.N.M.1990). And, indeed, this court heard a great deal of evidence on JCAHO accreditation during the 35–day hearing, and concludes that JCAHO accreditation does not ensure that patients are safe and not abused and neglected.

Admittedly, some courts have held that accreditation creates a presumption that a

---

**59.** *See, e.g.,* Plaintiffs' exh. I.B. 1(9): White report at 11; transcript of April 13, at 4174–78, filed April 14, 1995 (testimony of Wayne T.); transcript of April 14, 1995, at 4476–78, filed April 17, 1995 (testimony of White); plaintiffs' exh. IV.C. 4(5)n; plaintiffs' exh. IV.H. 21: BSI investigative report of case M7–0907–94 (concluding that in incident involving improper restraint "evidence ... is sufficient to establish reason to believe and probable cause to believe that staff members Mr. K. and Mr. Y. did abuse" a child at the Center and that Mr. Y. abused another child by the use of improper restraint techniques).

**60.** Plaintiffs' exh. I.B. 1(9): White report at 12–13; transcript of April 14, 1995, at 4478, filed April 17, 1995 (testimony of White). White's testimony as to the use of improper restraint was corroborated by both the testimony of Wayne T. (transcript of April 13, 1995, at 4174–78, filed April 14, 1995) and the Bureau of Special Investigation report of case M7–0907–94 (plaintiffs' exh. IV. H.21).

**61.** Defendants' brief in opposition to plaintiffs' motion for preliminary relief, filed May 26, 1995, at 44.

**62.** For example, in one incident a staff member "grabbed [a child] by the wrist and began pulling him across the floor toward the door ... [while he was] lying on the floor." Plaintiffs' exh. IV.C. 4(5)(n) at 001445. The facility characterizes such conduct as neglect, not abuse, and merely issued a written reprimand to the staff member. *Id.* at 001440. After three more instances of substantiated abuse or neglect, the Center terminated this staff member, in light of a long record of abuse of children and inappropriate behavior. Plaintiffs' ex. IV.C. 4(5)n at 001766–69: letter, dated October 28, 1993, from Anthony Dykes to Mr. M.

**63.** This court has rejected the defendants' contention that JCAHO accreditation, in and of itself, demonstrates compliance with any aspect of the consent decree or constitutionally required treatment. *See* Order, entered on March 3, 1995 (Doc. no. 680).

facility is meeting minimal standards of care, which include minimal safety standards. But, this is only a rebuttable prima facie presumption. *See, e.g., Thomas S. v. Flaherty,* 902 F.2d 250, 252–53 (4th Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990); *Woe v. Cuomo,* 729 F.2d 96, 106 (2d Cir.), *cert. denied,* 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). Even if the court were to accept the defendants' evidence of JCAHO accreditation as creating a presumption of safety, the evidence demonstrates that this presumption has been rebutted. Thus, while JCAHO accreditation may be evidence to be considered by the court in determining whether there is compliance with certain minimal standards, the weight it should be accorded is limited.

The defendants also contend that they have specific policies in place to guarantee children's safety. However, the mere presence of a policy if not implemented is meaningless.[64] In light of the above evidence, the court concludes that the defendants' current policies alone, either because they are not

implemented or they are not strong enough, are not sufficient to ensure substantial compliance with the *Wyatt* safety and abuse standards.

## IV. DISCUSSION

The court will now consider whether the plaintiffs are entitled to preliminary injunctive relief based on the four factors discussed previously.

### A. There Must be a Substantial Likelihood that the Plaintiffs Will Ultimately Prevail on the Merits

■■■ The first element of the four-prong test has been met. The court finds that there is current, pervasive, and severe gang activity, staff abuse of children, and improper use of restraint techniques at the Center. Thus, the preliminary findings of fact reflect that the defendants are not providing a safe environment for children at the Eufaula Adolescent Center in violation of *Wyatt* mental-illness standards 1, 7, and 19. These standards together require that the defendants provide a safe environment.[65] Standard 1

---

**64.** *See, e.g.,* AAPSC report and recommendations noting that the Eufaula Adolescent Center did not follow its own seclusion policies. Plaintiffs' exh. IV.C. 2(3) at 002611–12.

**65.** Furthermore, the fourteenth amendment to the United States Constitution requires that the defendants provide a safe environment to children committed to the Center. *Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982). The right to safe conditions "constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Id.* at 315, 102 S.Ct. at 2458 (quoting *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)). This right applies to those civilly committed for nonpenal purposes. *See, e.g., Youngberg,* 457 U.S. at 315, 102 S.Ct. at 2458; *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1246 (2d Cir. 1984).

The defendants contend that the majority of children at the Center are voluntarily admitted and therefore have no due process right to safe conditions. However, the court disagrees with the defendants' definition of voluntary. To be at an institution voluntarily means that the child may leave the institution if he or she wants. The Eleventh Circuit Court of Appeals has recognized that patients who enter an institution initially on a voluntary basis become involuntary patients who have due process rights under the fourteenth amendment, "To the extent that [those]

patients might be prevented from leaving." *Doe v. Public Health Trust of Dade County,* 696 F.2d 901, 903 n. 10 (11th Cir.1983) (per curiam). Children at the Center may not simply check themselves out. The children are there because their behavioral problems are so severe they must be in a locked and secure facility. While it is true that, if a child is 14 or older he or she may request to be released, it is not true that he or she will necessarily be released. The child must request a form and apply to be released, and then wait 72 hours for approval. The doctoral-level treatment staff and the psychiatrist may deny the release. Defendants' response to court's inquiry regarding voluntary status of residents at the Eufaula Adolescent Center, filed April 24, 1995 (Doc. no. 923), at exh. 5. Furthermore, under Policy No. 350–5, a facility director or clinical director "may deny release of a client who is a voluntary admission, if in his/her opinion, the release of the client would be unsafe for the client or others." *Id.* at exh. 4. The director must then seek formal commitment of that resident. If the child's behavior truly merits a secure facility, it is likely that this would more often than not be the case. Additionally, many of the voluntarily committed children have been told that they must either voluntarily go to the Center or go to a youth corrections facility. Plaintiffs' additional filing on the Eufaula Adolescent Center, filed May 1, 1995 (doc. no. 942), at exhs. 3, 4 and 9. These patients are not in any real sense free to leave, in that they are free only to leave to go to jail.

provides that "Patients have a right to privacy and dignity." *Wyatt,* 344 F.Supp. at 379. Standard 7 outlines the procedures for and sets restrictions on the seclusion and restraint of patients. *Wyatt v. King,* 793 F.Supp. at 1077–79.[66] It provides that "Seclusion and restraint shall not be used as punishment for the convenience of staff or in a manner that causes undue physical discomfort, harm, or pain to the patient," *id.* at 1079, and that "Patients may be placed in seclusion or physically restrained only ... to prevent a patient from physically injuring himself/herself or others." *Id.* at 1077. And Standard 19 provides that "A patient has a right to a humane psychological and physical environment within the hospital facilities. These facilities shall be designed to afford patients with comfort and safety, promote dignity, and ensure privacy. The facilities shall be designed to make a positive contribution to the efficient attainment of the treatment goals of the hospital."[67] *Wyatt,* 344 F.Supp. at 381.

## B. There Must be Proof that the Plaintiffs Will Suffer Irreparable Harm Unless the Injunction Issues

The second element has also been met. The conditions at the Center pose an immediate and substantial threat to the safety of children. Therefore, absent appropriate relief from this court, there is a substantial likelihood that the children at the Center will suffer irreparable harm. Of course, this concern raises the issue of what court-ordered relief would be appropriate.

At the court's request, the defendants proposed a remedy to correct any safety problems.[68] They proposed three measures: (1) to assign additional clinical staff to the boys' and girls' dormitories after school, in the evening, and on weekends to improve supervision of direct-care staff and patients; (2) to formulate a formal administrative leave policy for the Center, in order to facilitate a faster administrative response to abuse and neglect allegations; and (3) to report all allegations of staff-on-child and child-on-child abuse immediately to the associate commissioner to assure that the Center receives prompt attention from the highest officials at the Department when necessary. The defendants assert that these measures are clinically and administratively adequate, and they have implemented the first, are currently implementing the second, and will implement the third as soon as a new associate commissioner is appointed.

The plaintiffs proposed several measures: (1) appointing a special master or review panel to supervise the implementation of relief; (2) ending all admissions at the Center until it is made safe; (3) enjoining the Commissioner of the Department of Mental Health and Mental Retardation to ensure the safety, dignity, and humane treatment of children at the Center; (4) appointing a program manager to implement a safety program, among other programs, with power over management, budget, personnel, and programs at the Center; (5) appointing a services developer to develop discharge, transitional, and community services for the children at the Center; and (6) enjoining the defendants from reducing total spending for children and adolescent services, unless it can demonstrate that a reduction in spending will not affect the implementation of the court's order.

---

**66.** Standard 7 further provides in part:
"Patients have a right to be free from seclusion and physical restraint. Patients may be placed in seclusion or physically restrained only (a) to prevent a patient from physically injuring himself/herself or others, (b) after alternative treatment interventions have been unsuccessful or after determining that alternative treatment interventions would not be practicable, and (c) when authorized by a written order of a qualified physician who is physically present and has examined the patient. No order for seclusion or restraint may exceed eight hours."
*Wyatt,* 793 F.Supp. at 1077–79. The standard then provides for exceptions to its application, what written orders for exclusion or restraint

must contain, and how patients in seclusion or restraint are to be treated and managed. *Id.* at 1079.

**67.** Standard 19 then sets forth specific requirements for resident units, toilets and lavatories, showers, day rooms, dining facilities, linen servicing, housekeeping, geriatric-and-nonambulatory facilities, and the overall physical plants. *Wyatt,* 344 F.Supp. at 381–83.

**68.** The court requested the defendants to submit a proposed remedy, even though they might contend that no remedy is necessary. Transcript of May 8, 1995, at 7030, filed May 9, 1995.

While there are positive elements in both the defendants' and the plaintiffs' proposed relief measures, the court believes that the defendants' plan does not go far enough and that the plaintiffs' plan goes too far. The plaintiffs' plan essentially proposes a receivership, which the court believes is unwarranted at this time, in light of the fact that there appear to be other, less intrusive but still reasonably effective, measures available. The responsibility for the operations of Alabama's facilities lies with the state itself, and, therefore, this court should interject itself into the operation of a state institution only to the extent necessary.

The defendants' proposal is inadequate for three reasons. First, the three proposed measures are not sufficient to solve the safety and abuse problems at the Center. They do not address the pervasive and serious gang activities. Nor do they address the improper use of force in restraining children. The court will therefore require that the defendants include in their proposed measures additional measures to address these problems. Second, the court cannot rely solely on a "promise" by the defendants to implement any proposed measures. Throughout the history of this litigation, the defendants have left and continue to leave "a trail of broken promises." *Wyatt v. Wallis,* No. 3195–N, 1986 WL 69194, *6 (M.D.Ala. Sept. 22, 1986) (Thompson, J.). A formal court order, incorporating all measures necessary to address the safety problems at the Center, is warranted. The court will therefore require that the defendants, after soliciting and considering input from the plaintiffs and amicus curiae Unites States, develop and submit all of the above measures for inclusion in a formal order.

Third and finally, the defendants' past conduct teaches that, absent judicial oversight, even a court order is inadequate to assure compliance. Only when two circumstances are present does it appear that there can be any reasonable assurance of the defendants' immediate and substantial compliance with a court order. The first circumstance is that the defendants' conduct be kept out in the open subject to scrutiny by both the court and the public. The second circumstance is that there be direct pressure from an outside source. For example, only when the issue of gang activity was brought out in the open and the court applied direct pressure, did the defendants initiate an investigation. The court believes that the effects of these two circumstances can be achieved prophylactically through a limited measure: the temporary appointment of a monitor.

The monitor will be able to apply pressure on the defendants to move aggressively towards compliance with the *Wyatt* standards by keeping the issues of safety at the Eufaula Adolescent Center out in the open for scrutiny by the court and the public. While the precise duties and contours of the monitor are an issue for the defendants to resolve, the position should include the following:

· The monitor must be independent and free from any influence or control by either the defendants or the plaintiffs. The monitor must be unbiased in both appearances and in fact.

· The monitor must have adequate access to residents, staff, guardians, and to whomever else he or she needs to deal.

· While past *Wyatt* monitors have been full-time, the position need not be full-time at this time. The monitor must report to the court and parties at least once a month on the progress of the defendants.

· The monitor position need last for only one year from the day it is fully implemented. The court believes that the defendants should be able to comply with this order within less than one year. Moreover, the position should not become institutionalized. The one-year limitation should inspire the monitor to complete his or her task as soon as possible. A court's purpose in institutional litigation such as this is to remedy the violation and then to withdraw from any involvement in the affairs of the institution once it is operating in compliance with federal law. *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts,* 503 U.S. 467, 489–90, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992). However, if at the end of one year it appears that the monitor is still neces-

sary, the court will entertain a request to extend the position.

· The defendants shall bear the fees and expenses of the monitor.

The court has no preference as to whether the monitor consists of one individual or a group modeled after the Wyatt Committee.

Finally, it is often overlooked that the court is not the only entity responsible for assuring that the defendants comply with the law. Another entity is the public—in particular, those members of the public who have a direct interest in the operation of Alabama's Mental Health and Mental Retardation System because they have family and friends who reside in its facilities. The court will therefore direct that the defendants send to the parents or guardians of all residents, and their attorneys, if any, a copy of this memorandum opinion and the order and preliminary injunction accompanying this opinion. These court papers must be accompanied by a cover letter drafted by counsel for defendants, with input from counsel for plaintiffs, and approved by the court. The letter should explain to the parents, guardians, and their attorneys the need for them to monitor the conditions at the Eufaula Adolescent Center by visiting it personally and frequently. The letter should also explain to them how, without fear of reprisal to either themselves or patients, they may report concerns of abuse or lack of safety to the independent monitor. For a period of one year, these court papers and the cover letter shall also be furnished to the parents and guardians of all future residents of the Center and their attorneys.

### C. The Threatened Injury to the Plaintiffs Must Outweigh Whatever Damage the Proposed Injunction May Cause the Defendants

The third element has also been satisfied. The court has moved conservatively. The responsibility for addressing the problem of safety at the Eufaula Adolescent Center still remains where it should: with the defendants. The court has imposed a scheme limited in both time and function. The court has not required that the defendants cede any additional control or supervision of its facility. The court believes that this relief appropriately balances the interests of both the plaintiffs and the defendants.

### D. The Injunction Must not be Adverse to the Public Interest

Finally, the fourth element is also satisfied. Institutionalized children are "unlikely to be able to" protect their interests or "voice" their rights. *Wyatt v. Horsley,* 793 F.Supp. 1053, 1056 (M.D.Ala.1991) (Thompson, J.). Thus, the court, the parties, and the public have an especially important fiduciary responsibility to make sure that these children's interests are protected. Indeed, everyone connected with this litigation must be especially vigilant in monitoring and ensuring that the children's interests, especially their safety, are secured.

An appropriate order and injunction will be issued.

### ORDER AND PRELIMINARY INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The plaintiffs' motion for preliminary injunction, filed on April 17, 1995 (Doc. no. 901), is granted.

(2) The defendants Commissioner of the Alabama Department of Mental Health and Mental Retardation and Director of the Eufaula Adolescent Center are PRELIMINARILY ENJOINED and RESTRAINED from failing to take immediate and affirmative steps to provide for the safety and protection from abuse of all resident children at the Eufaula Adolescent Center, as required by *Wyatt* mental-illness standards 1, 7, and 19.

(3) Said defendants, after receiving and considering input from plaintiffs and amicus curiae United States of America, shall formulate and submit to the court, within 14 days, the following:

(A) A plan containing measures, as outlined in the accompanying memorandum opinion entered this date, to address and resolve immediately the severe and pervasive safety problems and abuse of resident

children at the Eufaula Adolescent Center; and

(B) A plan, as outlined in the accompanying memorandum opinion entered this date, providing for independent monitoring of the defendants' implementation of the above measures.

(4) Within 28 days from the date of this order, said defendants shall furnish the following to the parents or guardians of all residents of the Eufaula Adolescent Center and their attorneys, if any: a copy of this order and preliminary injunction and accompanying memorandum opinion, along with a cover letter, as outlined in the accompanying memorandum opinion entered this date. For a period of one year, these papers and the cover letter shall also be furnished to the parents and guardians of all future residents of the Center and their attorneys.

The clerk of the court is DIRECTED to issue a writ of injunction.

The United States Marshal or her representative is DIRECTED to serve a copy of this order and preliminary injunction and accompanying memorandum opinion on defendants Commissioner of the Alabama Department of Mental Health and Mental Retardation and Director of the Eufaula Adolescent Center.