**Ricky WYATT, By and Through his aunt and legal guardian Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,**

v.

**Kathy E. SAWYER, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health, Officer, et al., Defendants,**

**United States of America, Amicus Curiae.**

No. Civ.A. 70–T–3195–N.

United States District Court, M.D. Alabama, Northern Division.

Oct. 7, 1999.

---

Ira A. Burnim, Leonard S. Rubenstein, Linda V. Priebe, Washington, DC, James M. Lichtman, Ropes & Gray, Washington, DC, Fern Singer, Sirote & Permutt, Birmingham, AL, James A. Tucker, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, Kathryn H. Sumrall, Jackson, Garrison & Sumrall, Birmingham, AL, Allen Smith, Jr., Warm Springs, MT, Iris Eytan, San Francisco, CA, for plaintiffs.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Ricky J. McKinney, Burr & Forman, Birmingham, AL, Mary Elizabeth Culberson, Office of the Attorney General, Montgomery, AL, Charles B. Campbell, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, James Darrington Hamlett, Devereaux & Associates, Montgomery, AL, June E. Lynn, G.R. (Rick) Trawick, Department of Mental Health & Mental Retardation, Bureau of Legal Services, Montgomery, AL, Gregory D. Crosslin, Clifton E. Slaten, Mindi C. Robinson, Crosslin, Staten & O'Connor, P.C., Montgomery, AL, for defendants.

Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Bill Lann Lee, Robinsue Frohboese, Judith C. Preston, Tawana E. Davis, Robert C. Bowman, United States Department of Justice, Civil Rights Division, Special Litigation Section, Washington, DC, for United States of America, amicus.

## OPINION ON ATTORNEYS' FEES AND EXPENSES

MYRON H. THOMPSON, District Judge.

In this longstanding and contentious litigation, the plaintiffs (who represent all

current and future mentally-retarded and mentally-ill residents in the Alabama Mental Health and Mental Retardation System) sued the defendants (officials of the State of Alabama), claiming that conditions in the system's facilities violated residents' rights under state and federal law. This lawsuit is again before the court, this time on the plaintiffs' motion, filed on February 13, 1998, for attorneys' fees and costs pursuant to 42 U.S.C.A. § 1988; they seek $3,806,340.78 for the period from December 1, 1993, to December 31, 1997.[1] Based on the submissions of the parties between February 1998 and the present, and for the reasons that follow, the court will grant the motion, but only to the extent that the plaintiffs may recover $2,996,-064.24 in fees and expenses from the defendants.

## I. BACKGROUND

Admittedly, the size of the fee request now confronting the court is large. But, as is usually the case, and particularly in the law, context can make the difference. Therefore, the plaintiffs' fee request cannot be accurately and adequately addressed except against the backdrop of the circumstances that have led to the request itself. In its December 1997 opinion, which addressed the status of the litigation at that time, *See Wyatt v. Rogers*, 985 F.Supp. 1356 (M.D.Ala.1997) (Thompson, J.), and which can be read as a supplement to this order, the court delved in great detail into the history of this 28–year litigation.[2] The court will not do that here, but rather will touch upon some main events and milestones in an effort to give some idea, albeit a general one, of the context in which the court has had to consider the fee-and-expense request.[3]

*1970–1974:* This class-action lawsuit, commonly referred to as the *Wyatt* litiga-

tion, was filed by the plaintiffs against defendant officials of the State of Alabama in 1970. Noting that the plaintiffs' rights were "present ones, and they must be not only declared but secured at the earliest practicable date," the court entered injunctions requiring the defendants to bring state facilities into compliance with certain minimum constitutional standards. *See Wyatt v. Stickney*, 344 F.Supp. 373 (M.D.Ala.1972) (standards for mentally ill) (Johnson, J.), *aff'd in relevant part*, 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972) (standards for mentally retarded) (Johnson, J.), *aff'd in relevant part*, 503 F.2d 1305 (5th Cir.1974).[4] These mental-illness and mental-retardation standards, commonly known as the *Wyatt* standards, were designed to meet what the district court called the three "fundamental conditions for adequate and effective treatment," *Wyatt v. Stickney*, 334 F.Supp. 1341, 1343 (M.D.Ala.1971): "(1) a humane psychological and physical environment, (2) qualified staff in numbers sufficient to administer adequate treatment and (3) individualized treatment plans." *Id.*

*1986–1990:* In 1986, the court approved a consent decree resolving the parties' continued conflicts over the defendants' compliance with the *Wyatt* standards and the adequacy of the state's funding and administration of the state's mental health and retardation facilities. *See Wyatt v. Wallis*, 1986 WL 69194 (M.D.Ala. Sept.22, 1986) (Thompson, J.). First, the consent decree required that all the *Wyatt* standards "remain in effect," *id.* at *7, and that the defendants make substantial progress in achieving and maintaining compliance with all of the *Wyatt* standards. *Id.* at *3, *7. Second, the decree enjoined the defendants to make all reasonable efforts to

---

1. Doc. no. 1633.

2. Doc. nos. 1568 and 1569.

3. In this opinion, the court has not documented the background with reference to the court record to the extent that it did so in the December 1997 opinion. The reason is that it

is so easy to look at the latter for such purpose.

4. There are no document numbers for these and other filings and entries made before November 22, 1993. Not until after this date did the clerk of the court start giving document numbers to filings and entries.

achieve full accreditation of Alabama's mental health facilities by the Joint Commission on the Accreditation of Healthcare Organizations, commonly known as JCAHO, and certification of the mental retardation facilities through Title XIX of the Social Security Act, 42 U.S.C.A. §§ 1396, *et seq.* Third, the decree "substantially broaden[ed] the focus of the litigation to include community placement and require[d] that the defendants make substantial progress in placing people in the community." *Id.* at *5. Fourth, the parties were ordered to establish a "patient advocate system, operated within and by the Alabama Department of Mental Health and Mental Retardation, to help protect the rights of the plaintiff class"; they were also required to establish a "quality assurance system operated by the central office of the Alabama Department of Mental Health and Retardation to monitor and assure the quality of care provided by the Department." *Id.* at * 8. Fifth, the consent decree placed on the plaintiffs and the defendants the affirmative obligation "to cooperate" to establish "a process" by which "plaintiffs' counsel will be apprised of the progress made by the defendants" in meeting the substantive requirements, and, in addition, the defendants were to "continue to receive input from independent experts concerning means" of meeting the substantive requirements. *Id.* at *8. The parties were also directed to comply with a number of plans of compliance contained in documents filed with the court. *Id.* Pursuant to these provisions in the consent decree, the parties established what came to be known as the *Wyatt* Consultant Committee. *Wyatt v. Horsley,* No. 3195–N (M.D.Ala. Jan. 28, 1991) (Thompson, J.). Finally, the decree provided that, should the defendants fail to comply with the significant provisions in the settlement, the court would entertain requests to reactivate its active supervision of the Alabama Mental Health and Mental Retardation System. *Wyatt,* 1986 WL 69194, at *8.

Between 1987 and 1990, the *Wyatt* Consultant Committee worked with all involved—the defendants, their attorneys, plaintiffs' attorneys, and the court—to attempt to achieve compliance with the 1986 consent decree without resort to litigation. On November 30, 1990, however, the Commissioner of the Department of Mental Health and Mental Retardation, suddenly and without any prior notice, either to the court, the committee members, or plaintiffs' attorneys, terminated the services of the *Wyatt* Consultant Committee. At the time, several urgent matters were pending before the committee. The commissioner did not allow the committee a period of time to wrap up its affairs. There was no phasing out of the committee. The commissioner stated that he believed that the department had substantially complied with the consent decree and that he would be seeking such a determination from the court.

*1991–1997:* On January 18, 1991, the defendants moved for a finding that they had met their obligations under the 1986 consent decree and for an order terminating this lawsuit. In order to facilitate a quick and inexpensive resolution of the lawsuit without discovery, the court, with the approval of the parties, appointed Clarence Sundram to investigate and report to the court and parties the factual issues pertaining to the defendants' compliance with the outstanding orders of the court. Sundram's report on two facilities found that the department had made significant progress as to certain *Wyatt* standards. He found that the defendants successfully made substantial efforts to improve the physical environments of their institutions and hospitals and increased staffing ratios beyond their prior grossly deficient levels, thus resulting in compliance with many standards. He also found, however, that there remained significant problems and noncompliance as to other critical standards and rights, including treatment and habilitation, safety, assuring residents remain free from excessive and unnecessary medication, and, most significantly, unnecessary institutionalization.

Sundram was unable to complete his review of the system because the defendants breached their agreement by hiring another expert to duplicate Sundram's tours. When Sundram learned of the breach, he resigned, believing that he could no longer function as an independent expert.

In May 1991, the parties sought court approval of two consent decrees that proposed to modify several of the *Wyatt* standards. Primarily because of lack of support for the consent decrees among the state's mental health consumers and their advocates, the court refused to approve the decrees. *See Wyatt v. Horsley,* 793 F.Supp. 1053 (M.D.Ala.1991) (Thompson, J.). The court cautioned the parties as follows: "The court understands the difficulties class counsel faces in endeavoring to solicit the views of such persons. However, to the extent plaintiffs' counsel cannot receive input from class members, he must seek it from such secondary sources as public interest organizations, former mental patients, and family members and caregivers who have day-to-day contact with class members in the state's institutions. While fulfilling this duty may render the settlement process more complex and problematic, it is essential if the class attorney is to persuade the court that an agreement is in the best interests of the class, rather than merely expect the court to trust his professional judgment. To allow any less in a class action would be to accept the cynical view that the attorney for the plaintiffs is 'the dominus litus,' that is, the true master of the lawsuit, and the plaintiffs 'only a key to the courthouse door dispensable once entry has been effected.' *Saylor v. Lindsley,* 456 F.2d 896, 899 (2nd Cir.1972)." *Id.* at 1056. *See also Wyatt v. King,* No. 3195-N, 1991 WL 365043 (M.D.Ala. Oct.28, 1991) (Thompson, J.).

In May 1992, the parties submitted, for court approval, three new consent decrees modifying or deleting several mental-illness standards. This time the court approved the decrees, noting, among other things, that "The three new consent decrees currently before the court differ in many respects from those submitted to the court previously; most importantly, these decrees, unlike the earlier versions, now appear to have the support of a large segment of the mental health community. This is primarily due to the efforts of counsel for the plaintiff class and counsel for the defendants to involve the state's primary and secondary consumers, consumer organizations, and advocacy groups . . . in the revision of the decrees." *Wyatt v. King,* 793 F.Supp. 1058, 1062 (M.D.Ala. 1992) (Thompson, J.).

Later, in 1992, the court issued an order and memorandum opinion denying motions filed by the defendants that sought modification of the 1986 consent decree by eliminating certain requirements, including several provisions in the original 1972 *Wyatt* standards. *See Wyatt v. King,* 803 F.Supp. 377 (M.D.Ala.1992) (Thompson, J.). The defendants had sought the elimination of the following: the minimum standards that guarantee patients' rights to privacy, dignity, and humane treatment (mental-illness standard 1 and mental-retardation standard 15), the standard that recognizes the right of each mentally retarded patient to a habilitation program that will maximize his human abilities and enhance his ability to cope with his environment (mental-retardation standard 2), the standards that mandate the delivery of care and services in the least restrictive environment necessary (parts of mental-illness standards 2, 26, and 28, and parts of mental-retardation standards 3, 9, and 11) and the provisions in the 1986 consent decree that obligate the defendants to make substantial progress in placing residents of state institutions in community facilities and programs. The court held that the requirements for modification had not been met. *Id.*

The following January, in 1993, the court entered an order and memorandum opinion denying a motion filed by the defendants that sought the elimination of another *Wyatt* standard, mental-illness standard 34, which obligates them to provide class members with adequate transitional ser-

vices following release from a state facility. *See Wyatt v. King*, 811 F.Supp. 1533 (M.D.Ala.1993) (Thompson, J.) The defendants had alternatively requested that, should the court decline to vacate mental-illness standard 34, the court should clarify that the defendants may fully discharge their obligations under the standard by placing patients in existing programs as space permits, without creating any new programs or services to accommodate patients' needs, and by providing post-release care to each patient for a maximum period of one year following the patient's release. The court held that the requirements for modification and clarification had not been met.

Later, on July 11, 1995, the court approved a proposal by amicus curiae United States to modify *Wyatt* mental-retardation standard 22(b) (medication: unnecessary, excessive, review, etc.). *See Wyatt v. Poundstone*, 1995 WL 430939 (M.D.Ala. 1995) (Thompson, J.).[5]

On January 22, 1993, the plaintiffs brought a motion to enforce the 1986 consent decree, claiming that the defendants had failed to comply with the 1986 consent decree and were violating the Americans with Disabilities Act of 1990, commonly referred to as the ADA, 42 U.S.C.A. §§ 12101–12213.

In 1994, the parties resumed litigation after the collapse of extensive efforts in 1992 and 1993 to enter into an agreement to establish formal procedures for settlement of the current round of litigation on the pending substantive motions—that is, the defendants' January 18, 1991, motion for a finding that they had met their obligations under the 1986 consent decree and for an order terminating this litigation, and the plaintiffs' January 22, 1993, motion to enforce the 1986 consent decree and for further relief. *See Wyatt v. Hanan*, 871 F.Supp. 415, 417–20 (M.D.Ala.1994) (Thompson, J.) (discussing 1992 and 1993 efforts at settlement).[6]

Trial on the two substantive motions began in the spring of 1995. The trial lasted 35 days, spanning several months. The trial was followed by extensive briefing of the parties. Because the in-court trial of this case would have taken a half year to a year, the trial was, by agreement of the parties, a 'summary proceeding.' As a summary proceeding, the evidence was submitted in a jointly prepared record before the trial, and both the defendants' and the plaintiffs' live and in-court examination of witnesses was limited to 60 hours of direct and 30 hours of cross-examination, with rebuttal testimony limited to two days. The purpose of the live testimony was to highlight the most pertinent and relevant parts of the already–filed record. Nevertheless, the record that the court had to review was comparable to that of a trial lasting a half year to a year.

At the beginning of the trial, the court expressed special concern about violations of the *Wyatt* standards at one of the defendants' facilities, the Eufaula Adolescent Center. The center had been a secure, residential treatment facility that served 55 children ages 12 to 18, who had either a mental illness or emotional disturbance. The briefs and the evidentiary record filed prior to the trial indicated that there were pervasive and severe safety problems and abuse of resident children at the center. After presenting their evidence on the Eufaula Adolescent Center, the plaintiffs filed a motion requesting preliminary injunctive relief as to these safety problems.

On July 11, 1995, in response to the plaintiffs' motion for preliminary relief, the court entered a memorandum opinion preliminarily finding that resident children at the center were not safe due to pervasive and severe safety and abuse problems. This danger was most pronounced in three areas: gang activities, staff abuse, and the improper use of restraint techniques. *See Wyatt v. Poundstone*, 892 F.Supp. 1410 (M.D.Ala.1995) (Thompson, J.).[7] Condi-

---

5. Doc. no. 1123.

6. Doc. no. 242.

7. Doc. no. 1119.

tions in the facility were more that of an adult prison than a mental institution for minors.

The evidence therefore reflected that the defendants were in violation of, at least, the following *Wyatt* mental-illness standards: 2 and 34 (least restrictive environment and transitional care), 26 (adequate treatment and individual habilitation plans), 7 (seclusion and restraint), and 1 and 19 (safety and freedom from abuse). The court issued a preliminary injunction requiring, among other things, that the defendants "take immediate and affirmative steps to provide for the safety and protection from abuse of all resident children at the ... Center, as required by *Wyatt* mental-illness standards 1, 7, and 19." *Wyatt*, 892 F.Supp. at 1423.

The defendants appealed the preliminary injunction order to the Eleventh Circuit Court of Appeals. In the meantime, the Department of Mental Health and Mental Retardation closed the Eufaula Adolescent Center, and this court then stayed the preliminary injunction, finding that "the need for the preliminary injunction ... is moot." *Wyatt v. Poundstone*, 941 F.Supp. 1100, 1109 (M.D.Ala.1996) (Thompson, J.).[8] The court also informed the Eleventh Circuit that upon remand of this appeal it would dissolve the preliminary injunction. *Id.* The Eleventh Circuit then dismissed the appeal, *Wyatt v. Rogers*, 92 F.3d 1074 (11th Cir.1996), and this court dissolved the preliminary injunction. Nevertheless, the plaintiffs were still successful in redressing the conditions at the center, and without the plaintiffs' efforts the center's intolerable conditions would have continued.

During trial and at the invitation of the court, the defendants filed motions, which the court granted, for a judgment on partial findings of compliance of the following pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, *see Wyatt v.*

*Poundstone*, 1995 WL 1110022 (M.D.Ala. April 5, 1995) (Thompson, J.)[9]; *Wyatt v. Poundstone*, 1995 WL 1110023 (M.D.Ala. April 17, 1995) (Thompson, J.)[10]; *Wyatt v. Poundstone*, No. 3195–N, 1995 WL 569121 (M.D.Ala. April 18, 1995) (Thompson, J.)[11]; *Wyatt v. Poundstone*, No. 3195–N, 1995 WL 938444 (M.D.Ala. December 5, 1995) (Thompson, J.)[12]: mental-illness standards 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 11 (wear own clothes; keep possessions), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 21 (staff licensing and certification requirements), and 25 (patient exams following admission); mental-retardation standards 8 (evaluation within 14 days of admission), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 32 (outdoors at regular intervals), 33 (resident labor, etc.), and 45 (no organ removal); and ¶ 8 of the 1986 consent decree, which required the defendants "to make all reasonable efforts to achieve full accreditation of Alabama's mental health facilities by the [JCAHO] and full certification of Alabama's mental retardation facilities under Title XIX ...—and once attained, to continue to maintain such accreditation and certification." *Wyatt*, 1986 WL 69194, at *7 (¶ 8).

While the court readily found ¶ 8 compliance with all facilities, the court wrote that it "finds that the Department achieved full accreditation of the Eufaula Adolescent

8. Doc. no. 1317.

9. Doc. no. 848.

10. Doc. no. 906.

11. Doc. no. 911.

12. Doc. no. 1277.

Center as of May 1994, and that the Department has so far maintained such accreditation," but that, "between 1986 and late 1991, the defendants did not take 'all reasonable efforts' to obtain accreditation." *Wyatt v. Poundstone,* 1995 WL 1110023 (M.D.Ala. April 17, 1995) (Thompson, J.).[13]

On December 22, 1994, in the midst of heated and extensive preparations for trial by the parties and the court, the defendants unexpectedly filed a last-minute motion to recertify or modify the plaintiff class. They requested that the court and the parties redirect their limited time and energy to doing the following: appoint new class representatives and new class counsel; explicitly state who was in the class; clarify whether this class action was pursuant to subsection (b)(2) or (b)(3) of Rule 23 of the Federal Rules of Civil Procedure; permit members of the plaintiff class to opt out of the class pursuant to subsection (b)(3) of the rule if they wish; and issue notice to class members pursuant to subsection (d)(2) of the rule. On January 18, 1995, after over 24 years of litigation, the defendants filed a supplemental motion adding an alternative request to decertify the plaintiff class. The defendants argued that the class should be decertified because there had never been a formal order of certification, because the former named plaintiffs' claims were moot, and because of a conflict of interest within the plaintiff class.

After trial and while the appeal regarding the Eufaula Adolescent Center was pending, the court refused to decertify the plaintiff class and, instead, allowed additional plaintiffs to intervene and recertified "A plaintiff class consisting of all current and future mentally-retarded and mentally-ill residents of any facility, hospital, center, or home, public or private, to which they are assigned or transferred for residence by the Alabama Department of Mental Health and Mental Retardation, ... pursuant to Fed.R.Civ.P. 23(a) &

(b)(2)." *Wyatt v. Poundstone,* 169 F.R.D. 155 (M.D.Ala.1995) (Thompson, J.).[14]

In recertifying the plaintiff class, the court rejected the defendants' contention that the class should be immediately decertified because of a conflict of interest within the plaintiff class between those who advocate community placement of residents and those who oppose it. It appeared that any conflict within the plaintiff class resulted, at least in large part, from misinformation disseminated by the defendants. The defendants had sent letters to class members, their guardians, caregivers, and next-of-kin informing them that the plaintiffs and their attorneys were seeking to have services for all class members reduced and full deinstitutionalization of the mentally-retarded, that is, to have all mentally-retarded class members now residing in the defendants' developmental centers moved into the community. The defendants failed to state in their letters that the plaintiffs advocate that the defendants be required to develop more extensive and greater community services and that institutionalized residents be given the 'choice' between institutionalization and community placement. With this omission, the defendants left the important misimpression that the plaintiffs sought to close the state's facilities and force patients out without any support services.

The defendants' letters went on to state that the Department of Mental Health and Mental Retardation was objecting to producing class members' records to plaintiffs' attorneys and encouraged the guardian or family member to contact the department if he or she objected to counsel having access to their ward's records. These letters were sent to guardians after the court had specifically cautioned the defendants not to "encourage" plaintiffs and their guardians to object to producing the class members' records without explicit approval of the district court—approval which was not obtained. Also, some of the letters

---

**13.** Doc. no. 906.

**14.** Doc. no. 1232.

implied (with a space provided for approval or disapproval of the release of information to plaintiffs' counsel) that guardian-or-parent approval was necessary to release the information, despite the fact that mental-illness standard 31 expressly gives to plaintiffs' counsel and their agents, in the same manner that it gives to employees of the Department of Mental Health and Mental Retardation, the right to full access to patients' records.

In the wake of the dismissal of the appeal, the court entered an order on October 8, 1996, denying plaintiffs' motion for enforcement except to the extent they sought relief other than under the 1986 consent decree. *Wyatt v. Rogers,* 942 F.Supp. 518 (M.D.Ala.1996) (Thompson, J.).[15] The court reasoned: "In its [1996] opinion ..., the Eleventh Circuit stated that 'Precedent dictates that a plaintiff seeking to obtain the defendant's compliance with the provisions of an injunctive order move the court to issue an order requiring the defendant to show cause why he should not be held in contempt and sanctioned for his non-compliance.' 92 F.3d at 1078 n. 8. The appellate court concluded that, with their motion for enforcement filed in January 1993 ..., the plaintiffs ... 'have not resorted to the traditional means of enforcing injunctions.' *Id.*" *Wyatt,* 942 F.Supp. at 520.

Finally, on December 15, 1997, after reviewing the extensive record submitted by the parties and after consideration of the additional evidence presented in open court, the court entered a lengthy decision holding that the defendants' motion for a finding that they have met their obligations under the 1986 decree and for an order terminating this lawsuit should be granted in part and denied in part, and that the plaintiffs' motion for relief other than under the 1986 consent decree should be denied. *See Wyatt v. Rogers,* 985 F.Supp. 1356 (M.D.Ala.1997) (Thompson, J.).[16]

The court held that the defendants should be released from the following requirements of the 1986 consent decree:

● *Wyatt* mental-illness standards 3 (no incompetency by reason of commitment), 5 (send/receive mail), 8 (experimental research), 9 (lobotomy/averse conditioning, etc.), 10 (prompt and adequate medical treatment), 11 (wear own clothes; keep possessions), 12 (clothing allowance, selection), 13 (laundering of clothes), 17 (interaction with members of opposite sex), 18 (patient labor, etc.), 20 (nutritional standards), 21 (staff licensing and certification requirements), 22 (orientation training for nonprofessional staff), 24 (minimum number of treatment personnel), 25 (patient exams following admission), 30 (entitlement to physical care), and 32 (special provisions for children, young adults).

● *Wyatt* mental-retardation standards 4 (borderline, mildly MR not institutionalized), 5 (educational services), 6 (prompt and adequate medical treatment), 7 (pre-admission examination/diagnosis required), 8 (evaluation within 14 days of admission), 9 (individualized habilitation plan), 13 (entitlement to physical care), 14 (records maintained; kept confidential), 17 (no incompetency by reason of commitment), 18 (religion), 19 (telephone/visitation rights), 20 (send/receive mail), 21 (interaction with opposite sex), 22(a)–(b), (e)–(g) (medication: unnecessary, excessive, review, etc.), 23 (no seclusion; "time-out" ok), 24 (behavior modification only with consent), 25 (electric shock only for extraordinary circumstances), 26 (physical restraint only when absolutely necessary, etc.), 29 (no experimental treatment without consent), 30 (no unusual or hazardous treatment without consent), 31 (physical exercise), 32 (outdoors at regular intervals), 33 (resident labor, etc.), 34(a) & (c–d) (nutritional standards, diet, etc.), 36 (personal possessions), 39 (staff li-

---

**15.** Doc. no. 1447.

**16.** Doc. nos. 1568 and 1569.

censing and certification requirements), 40 (QMRP supervision of staff), 44 (behavior modification, etc.), and 45 (no organ removal).

- JCAHO accreditation at all their mental-illness facilities and Title XIX certification at all their mental-retardation facilities.

The court held that the defendants should not be released from the following requirements:

- *Wyatt* mental-illness standards 1 (privacy and dignity), 2 (least restrictive conditions), 4 (visitation rights), 6 (freedom from unnecessary medication), 7 (freedom from seclusion/physical restraint), 14 (physical exercise), 15 (outdoors at regular intervals), 16 (religion), 19 (humane environment; facilities; etc.), 23 (supervision of staff, patient treatment), 26 (individualized treatment plan, etc.), 31 (confidentiality of records, etc.), 34 (transitional treatment post-release), and 35 (written notice of mental-illness standards).

- *Wyatt* mental-retardation standards 1 (general right to habilitation), 2 (habilitation program to maximize abilities), 3 (admission standards; habilitation is feasible, etc.), 10 (post-institutionalization plan), 11 (QMRP supervision of plan), 12 (plan reviewed by QMRP, team, etc.), 15 (dignity, privacy, humane care), 16 (no state/federal rights lost), 22(c)–(d) (medication: unnecessary, excessive, review, etc.), 27 (no corporal punishment), 28 (no mistreatment, abuse, neglect), 34(b) (nutritional standards, diet, etc.), 35 (clothing allowance, selection, etc.), 37 (grooming practices, etc.), 38 (humane environment, facilities, etc.), 41 (staffing ratios), 42 (written copy of standards upon admission), 43 (written reports every 6 months), 47 (transitional habilitation program), and 49 (no admission to institution not meeting above standards, etc.).

- Provisions in the consent decree requiring that they provide additional and new community facilities and programs and for the placement of patients in these facilities and programs to the extent they qualify based on professional judgment.

And the court further found that:

- The defendants exposed children at the Eufaula Adolescent Center to grave and serious danger. Their reaction to the information was to deny it, without investigation.

- The defendants breached their agreement for Sundram to do a comprehensive review of the system. The defendants' reaction to critical reports was to get rid of the reporter.

- The defendants suddenly and summarily dismissed the *Wyatt* Consultant Committee. Again, the defendants' reaction to critical reports was to get rid of the reporter.

- The defendants misrepresented in letters to plaintiff class members and their guardians, caretakers, and next-of-kin that the plaintiff class and their attorneys sought to close state facilities and force patients out without any community support services.

- The defendants were less than diligent in obtaining JCAHO accreditation at the Eufaula Adolescent Center, and they even actually suspended it without court approval.

In denying the plaintiffs' motion for further relief, the court explained that the plaintiffs had not pointed to anything in the ADA or the due-process clause of the fourteenth amendment that is not already required by the 1986 consent decree. The court therefore saw no need to address the plaintiffs' ADA and due-process-clause arguments separately. Moreover, in *Wyatt v. Rogers*, 92 F.3d 1074 (11th Cir.1996), the Eleventh Circuit Court of Appeals made clear what the plaintiffs needed to do to seek relief under the consent decree. The plaintiffs' request for relief directly under the ADA and the due-process clause could be viewed as an improper way to get around this approach.

In the December 1997 decision, the court indicated that the defendants were

close to compliance with a number of standards or requirements, and the court set up a procedure of monthly status conferences to prod the parties into resolving their difference over these standards. Pursuant to this procedure and at the request of the parties, the court has now released the defendants from the following additional requirements by agreement of the parties: mental-illness standards 4, 14, 15, 16, 23, 31, and 35 and mental-retardation standards 27, 38, and 42. And subject to certain conditions, the court also released the following state facilities: Mary Starke Harper Geriatric Psychiatry Center in full; S.D. Allen Intermediate Care Facility in full; Alice M. Kidd Intermediate Care Facility in full; Claudette Box Nursing Facility in full; North Alabama Regional Hospital in full; Greil Memorial Psychiatric Hospital in full; and Thomasville Mental Health Rehabilitation Center except as to mental-illness standards 1, 2, and 34; ¶¶ 5 and 9 of the 1986 consent decree. *See Wyatt v. Sawyer*, 1999 WL 805285 (M.D.Ala. October 4, 1999) (Thompson, J.)[17]; *Wyatt v. Rogers*, 1998 WL 862920 (M.D.Ala. December 9, 1998) (Thompson, J.)[18]; *Wyatt v. Rogers*, 1998 WL 264783 (M.D.Ala. May 14, 1998) (Thompson, J.)[19]; *Wyatt v. Rogers*, 1998 WL 213779 (M.D.Ala. April 21, 1998) (Thompson, J.)[20].

17. Doc. no.1951.

18. Doc. no. 1790.

19. Doc. no. 1717.

20. Doc. no. 1695.

21. The plaintiffs' motion is actually entitled a motion for fees and *costs*, not fees and *expenses*. 'Expenses' and 'costs' are not the same in the context of litigation. In *Eagle Insurance Co. v. Johnson*, 982 F.Supp. 1456, 1458 (M.D.Ala.1997) (Thompson, J.), *aff'd*, 162 F.3d 98 (11th Cir.1998) (table), this court explained:

> "... The 'costs' authorized by Rule 54(d)(1) [of the Federal Rules of Civil Procedure] is a term of art not synonymous with expense. 10 James Wm. Moore et al., Moore's Federal Practice § 54.103, at 54–174.

It is against this background, albeit given in a very summary form, that the court now considers the plaintiffs' motion for attorneys' fees and costs.

## II. ENTITLEMENT TO FEES AND EXPENSES

In federal civil rights litigation, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C.A. § 1988(b). As stated, the plaintiffs seek $ 3,806,340.78 for fees and expenses, which request may be broken down as follows:[21]

| ATTORNEYS | HOURS | | RATES | | SUBTOTALS |
|---|---|---|---|---|---|
| **BAZELON CENTER:** | | | | | |
| I.A. Burnim | 2,587.600 | × | $275 | = | $ 711,590.00 |
| C. Schlosberg | 2,830.120 | × | 250 | = | 707,530.00 |
| S.R. Jackson | 1,659.550 | × | 200 | = | 331,910.00 |
| E. Harris | 1,857.750 | × | 150 | = | 278,662.50 |
| A.A. Bridge | 1,847.750 | × | 140 | = | 258,685.00 |
| M. Giliberti | 849.600 | × | 140 | = | 118,944.00 |
| | | | | | |
| **ROSS, DIXON & MASBACK (RD & M):** | | | | | |
| P.G. Thompson | 54.000 | × | 260 | = | 14,040.00 |
| | 1.500 | × | 280 | = | 420.00 |
| A.I. Cohen | 307.600 | × | 130 | = | 39,988.00 |
| | 203.600 | × | 155 | = | 31,558.00 |
| E. Salovaara | 118.600 | × | 130 | = | 15,418.00 |
| J. Mathis | 23.900 | × | 135 | = | 3,226.50 |
| | | | | | |
| **CARLTON, FIELDS, WARD, EMMANUEL, SMITH & CUTLER (CFWES & C):** | | | | | |
| S. Walbolt | 36.800 | × | 275 | = | 10,120.00 |
| E.K. Bittick | 77.500 | × | 165 | = | 12,787.50 |
| E. Adams | 1.300 | × | 95 | = | 123.50 |
| | | | | | |
| **ARNOLD & PORTER:** | | | | | |
| R.S. Mintz | 55.250 | × | 245 | = | 13,536.25 |
| | 80.000 | × | 265 | = | 21,200.00 |

> "In other words, expense includes all the expenditures actually made by a litigant in connection with the lawsuit. 10 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2666, at 173. Whereas the costs that the district court may award under Rule 54(d)(1) are listed in 28 U.S.C.A. § 1920, and a district court may not award other costs or exceed the amounts provided in § 1920 without explicit authorization in another statutory provision. 10 Moore's Federal Practice § 54.103[3][a], at 54–176. The costs, therefore, associated with litigation almost always will amount to less than the successful litigant's total expenses in connection with the lawsuit. 10 Wright & Miller, Federal Practice and Procedure § 2666, at 173."

Because, aside from fees, what the plaintiffs seek here is not limited to what is available under Rule 54, the court will refer to their non-fee requests as 'expenses.'

| | | | | | |
|---|---|---|---|---|---|
| R.B. Conley | 20.500 | × | 170 | = | 3,485.00 |
| | 1.250 | × | 185 | = | 231.25 |
| | 10.000 | × | 189 | = | 1,890.00 |
| | 114.250 | × | 199 | = | 22,735.75 |
| D.A. Heim | 49.250 | × | 225 | = | 11,081.25 |
| | 9.750 | × | 230 | = | 2,242.50 |
| L. Louie | 73.750 | × | 230 | = | 16,962.50 |
| | 3.500 | × | 235 | = | 822.50 |
| **OTHER ATTORNEYS:** | | | | | |
| K.H. Sumrall | 1,242.100 | × | 250 | = | 310,525.00 |
| F. Singer | 475.671 | × | 225 | = | 107,025.98 |
| A. Smith, Jr. | 572.500 | × | 175 | = | 100,187.50 |
| J.A. Tucker | 505.950 | × | 175 | = | 88,541.25 |
| I. Eytan | 154.000 | × | 135 | = | 20,790.00 |
| SUBTOTAL | | | | | $3,256,259.73 |
| Expenses | | | | | 550,081.05 |
| TOTAL | | | | | $3,806,340.78 |

While, in the opening paragraph of their fee-and-expense motion, the plaintiffs state that they are seeking $ 3,804,354.53 ($ 3,254,273.48 for fees and $ 550,081.05 for expenses), the plaintiffs later indicate on page five of their motion that they are seeking $ 3,804,381.53 ($ 3,254,300.48 for fees and $ 550,081.05 for expenses), for a $ 27.00 difference.[22] In addition, this court indicates in the above chart that the plaintiffs are seeking yet a third different amount: $ 3,806,340.78 ($ 3,256,259.73 for fees and $ 550,081.05 for expenses). These differences result from miscalculations by the plaintiffs. First, of all, the *fee* request on page five for $ 3,254,300.48 (as opposed to the plaintiffs' total fee-and-expense request of $ 3,804,381.53) should be $ 3,254.273.48; the plaintiffs incorrectly summed the last column by $27.00.

Second, the $ 3,254.273.48 calculation is understated by $ 1,986.25. The plaintiffs miscalculated Schlosberg's and Walbolt's fees as follows:

Schlosberg: 2,830.120 hours × $ 250 = $ 707,530.00, not $ 706,647.75 (as set forth in the plaintiffs' motion), for a difference of $ 882.25.

Walbolt: 36.800 hours × $ 275 = $ 10,-120.00, not $ 9,016.00 (as set forth in the plaintiffs' motion), for a difference of $ 1,104.00.

Thus, the plaintiffs understated Schlosberg's and Walbolt's fees by $ 1,986.25 ($ 882.25 + $ 1,104.00). When $ 1,986.25 is added to $ 3,254,273.48, the total fee request is $ 3,256,259.73, and, in turn, the total fee-and-expense request is $ 3,806,-340.78, as set forth in the court's chart.

Whether the plaintiffs are entitled to recover all or part of the $ 3.8 million fee-and-expense request turns on whether they are "prevailing parties" within the meaning of § 1988. In *Hensley v. Eckerhart,* the Supreme Court held that, under § 1988, a plaintiff may be considered a prevailing party if the plaintiff succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). As the Supreme Court explained in *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* awards of attorneys' fees and expenses are not dependent upon the plaintiff succeeding on 'all' of his claims or even on achieving success on the 'central' issue in the litigation. 489 U.S. 782, 790–91, 109 S.Ct. 1486, 1492–93, 103 L.Ed.2d 866 (1989). All the significant-relief standard requires is that the plaintiff receive at least some relief on the merits of his claim. Once this requirement is met, the plaintiff has, in general, crossed the threshold to a fee-and-expense award of some kind. *See id.* at 792, 109 S.Ct. at 1493.[23]

---

**22.** *See* plaintiffs' motion for attorneys' fees and costs, filed February 13, 1998 (Doc. no. 1633).

**23.** Because there are exceptions, the plaintiff has crossed this threshold 'in general' only. In *Medders v. Autauga County Bd. of Educ.,* 858 F.Supp. 1118, 1123 (M.D.Ala.1994) (Thompson, J.), this court explained:

"Although the magnitude of relief obtained is irrelevant for purposes of determining whether a party has prevailed, it is relevant in determining whether fees should be awarded and, if so, how much." 'In some circumstances, even a plaintiff who formally "prevails" . . . should receive no attorney's fees at all.' [*Farrar v. Hobby,* 506 U.S. 103, 115, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992)]. One of the critical factors in determining the amount of the fee award is the plaintiff's 'overall success.' *Garland,* 489 U.S. at 793, 109 S.Ct. at 1494. If the plaintiff has technically prevailed but has essentially failed in obtaining any of the relief sought, then "the only reasonable fee"

■ The plaintiffs here were prevailing parties when, in 1972, the court entered injunctions requiring the defendants to bring state facilities into compliance with the *Wyatt* standards. In addition, because "[p]arties 'prevail' when they vindicate rights through a consent judgment," *Turner v. Orr*, 785 F.2d 1498, 1503 (11th Cir. 1986), the plaintiffs also prevailed in 1986 when they submitted to the court, and the court approved, a consent decree, which required, among other things, that all *Wyatt* standards "remain in effect," *Wyatt v. Wallis*, 1986 WL 69194, at *7 (M.D.Ala. Sept.22, 1986) (Thompson, J.), and which "substantially broaden[ed]" the focus of the litigation to include community placement and requir[ed] that the defendants make substantial progress in placing people in the community. *Id.* at *5. The critical question presented here is whether the plaintiffs are entitled to recover attorneys' fees and expenses for time since entry of the 1986 consent decree, and, in particular, from 1993 to 1997.

■ In complex institutional litigation that often entails extensive remedial efforts over a long period of time, it is generally accepted that prevailing plaintiffs are entitled to post-judgment fee-and-expense awards for legal services necessary for securing compliance with, and reasonable monitoring of, the decree. *See Turner*, 785 F.2d at 1502–1505; *Adams v. Mathis*, 752 F.2d 553, 554 (11th Cir.1985) (per curiam); *Miller v. Carson*, 628 F.2d 346, 348–349 (5th Cir.1980).

The reasoning underlying this general notion can be viewed as two-fold. First, "[c]omplex civil rights cases seldom end with the grant of a permanent injunction." *Association for Retarded Citizens of North Dakota v. Schafer*, 83 F.3d 1008, 1010 (8th Cir.1996). "The injunction must be implemented, that process must be monitored, and lingering or new disputes over interpretation of the decree must often be presented to the court for resolution. These functions take time and effort by the prevailing party's attorney." *Id.* Second, the

nature of the relationship between the plaintiff and the defendant, after a judgment in plaintiff's favor, changes, or should change, dramatically. For pre-judgment fees and expenses, the plaintiff and the defendant have divergent goals, and each is viewed as having lost or won depending upon in whose favor the court has found. By contrast, after a judgment in the plaintiff's favor, the plaintiff and the defendant have an essentially common goal: compliance with the judgment. Thus, in the post-judgment years, *both* the plaintiff and the defendant prevail when the defendant reaches full compliance: the plaintiff prevails because he has obtained the relief he sought, and the defendant prevails because it can now be released from the judgment.

■ In line with this approach, when a plaintiff engages in activity other than monitoring—for example, when he seeks some affirmative additional relief or opposes later efforts of the defendant to set aside the judgment—it is not necessary that the plaintiff succeed in full, that is, that he prevail on a specific issue in order to recover the fees and expenses connected with that issue. The fees and expenses "incurred in [the plaintiff's] post-judgment efforts at monitoring and enforcement are properly payable by the defendants as those of a 'prevailing party' whether or not [the plaintiff] prevails in each individual post-judgment effort because these 'measures necessary to enforce the remedy ordered by the [district] court cannot be severed from the matters upon which the plaintiff prevailed' in obtaining the judgment." *Turner*, 785 F.2d at 1504 (quoting *Adams*, 752 F.2d at 554). Or, as the former Fifth Circuit Court of Appeals put it, "[b]ecause issues may at times be reasonably related," the district court in assessing post-judgment work must resist the temptation to "always sever an attorney's work into 'issue parcels' and then assess that work for purposes of a fee award in terms of the outcome of each issue standing alone." *Miller*, 628 F.2d at 348.

may be 'no fee at all.' *Farrar*, 506 U.S. at 115, 113 S.Ct. at 575."

Nevertheless, the mere fact that efforts are post-judgment does not mean that they are compensable. First, "when 'claims distinctly different from the underlying lawsuit' arise after resolution of the main civil rights issues, plaintiffs must prevail on these unrelated claims to be entitled to a fee award of the post-judgment work." *Schafer*, 83 F.3d at 1011 (quoting *Willie M. v. Hunt*, 732 F.2d 383, 386 (4th Cir.1984)). Second, even if the post-judgment work is solely in pursuit of compliance with the judgment, the work must still "be reasonable and necessary," *Schafer*, 83 F.3d at 1011, as measured by the standard articulated in *Hensley v. Eckerhart* "that requires balancing the amount of effort against plaintiffs' overall success." *Schafer*, 83 F.3d at 1011.

Without question, because the plaintiffs here successfully obtained the 1972 injunctions and the 1986 consent decree, they are prevailing parties under § 1988, and, as prevailing parties, they are entitled to be reimbursed for reasonable fees and expenses incurred in monitoring the implementation of, and securing compliance with, the injunctions and the consent decree. The critical question, however, is whether they are entitled to the $3.8 million they seek in fees and expenses, for sometimes the fact of having prevailed only gets the plaintiff's foot in the door.

The court concludes, for the reasons that follow, that the plaintiffs are entitled to only some of their fees and expenses.

## III. REASONABLE FEES AND EXPENSES

The starting point in setting any fee award for an attorney is determining the 'lodestar' figure—that is, the product of the number of hours reasonably expended to prosecute the lawsuit and the reasonable hourly rate for work performed by similarly-situated attorneys in the community. *See Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988). The fee applicant bears the burden of "establishing entitlement and documenting the appropriate hours and hourly rates." *Norman*, 836 F.2d at 1303. This burden includes supplying the court with specific and detailed evidence from which the court can determine the reasonable hourly rate, maintaining records to show the time spent on the different claims, and setting out with sufficient particularity the general subject matter of the time expenditures so that the district court can assess the time claimed for each activity. *See American Civil Liberties Union v. Barnes*, 168 F.3d 423, 427 (11th Cir.1999). "A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case." *Id.* (quoting *Norman*. 836 F.2d at 1303).

A fee applicant should also exercise "billing judgment," *Barnes*, 168 F.3d at 428 (quoting *Hensley v. Eckerhart*, 461 U.S. at 434, 103 S.Ct. at 1939–40), that is, the applicant should "exclude from his fee applications 'excessive, redundant, or otherwise unnecessary [hours],' *id.*, which are hours 'that would be unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel.'" *Id.* (quoting *Norman*, 836 F.2d at 1301 (emphasis in original)).

"Those opposing fee applications have obligations, too. In order for [district] courts to carry out their duties in this area, 'objections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'" *Barnes*, 168 F.3d at 428 (quoting *Norman*, 836 F.2d at 1301).

After calculating the lodestar fee, the court should then proceed with an analysis of whether any portion of this fee should be adjusted upwards or downwards. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).

■ In making the above determinations, the court is guided by the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). *See also Blanchard v. Bergeron*, 489 U.S. 87, 91–92, 109 S.Ct. 939, 943–44, 103 L.Ed.2d 67 (1989). These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases.

### A. Reasonable Hours

The plaintiffs' attorneys seek compensation for 15,824.891 hours, for the time from December 1993 to December 1997, and for the time incurred in the pursuit of their fees and expenses, some of which occurred since 1997. *See Johnson v. Mississippi*, 606 F.2d 635, 638 (5th Cir.1979) (compensation for time expended in the pursuit of attorneys' fees is proper). Their requested hours may be broken down as follows:

| ATTORNEYS | HOURS |
|---|---|
| **BAZELON CENTER:** | |
| Burnim | 2,587.600 |
| Schlosberg | 2,830.120 |
| Jackson | 1,659.550 |
| Harris | 1,857.750 |
| Bridge | 1,847.750 |
| Giliberti | 849.600 |
| | |
| **RD & M:** | |
| Thompson | 55.500 |
| Cohen | 511.200 |
| Salovaara | 118.600 |
| Mathis | 23.900 |
| | |
| **CFWES & C:** | |
| Walbolt | 36.800 |
| Bittick | 77.500 |
| Adams | 1.300 |

| ATTORNEYS | HOURS |
|---|---|
| **ARNOLD & PORTER:** | |
| Mintz | 135.250 |
| Conley | 146.000 |
| Heim | 59.000 |
| Louie | 77.250 |
| | |
| **OTHER ATTORNEYS:** | |
| Sumrall | 1,242.100 |
| Singer | 475.671 |
| Smith | 572.500 |
| Tucker | 505.950 |
| Eytan | 154.000 |
| | |
| **TOTAL** | 15,824.891 |

The court considers three *Johnson* factors—the time and labor required, the novelty and difficulty of the case, and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed by the plaintiffs' counsel. Or, to put it more succinctly, as stated above, the court must balance the amount of effort against the plaintiffs' overall success. Here, the plaintiffs' overall success was two-fold: first, securing compliance with those *Wyatt* standards and other court-ordered requirements from which the court has so far released the defendants; and, second, holding the defendants' feet to the fire with regard to those standards from which the defendants have yet to be released. The critical question for the court is whether the hours expended by the plaintiffs' counsel were reasonable in light of this quite substantial success.

■ *Appellate Work:* Some of the hours requested by the plaintiffs is for work done in pursuit of fees and expenses for work done on appeals in this case; in other words, these fees were for work in pursuit of appellate fees. The Eleventh Circuit has made clear that a district court is not authorized to award fees and expenses for appellate work; instead, "If a party wishes to obtain fees on appeal, he or she must file a petition with the clerk of [the Eleventh Circuit] within fourteen days of the issuance of the opinion of [that] court." *Mills v. Freeman*, 118 F.3d 727, 734 (11th Cir.1997); *see also Davidson v. City of Avon Park*, 848 F.2d 172, 173 (11th

Cir.1988) ("As to fees for services on appeal, we hold that the district court is not authorized ... to control the filing time or assessment of attorney's fees for services rendered on appeal.").[24] If a district court is not authorized to award fees and expenses for appellate work it follows that a district court is not authorized to award fees and expenses for work done in pursuit of appellate fees and expenses. But more importantly here, the Eleventh Circuit denied the plaintiffs' fee request. The reason the Eleventh Circuit had in denying the plaintiffs' fee request would also warrant denying the plaintiffs' fee request for work done in pursuit of those denied fees.[25] The court will therefore deny the following hours which the plaintiffs have identified were for work done in pursuit of appellate fees:

| ATTORNEYS | HOURS |
|---|---|
| BAZELON CENTER: | |
| Burnim | 18.800 |
| Schlosberg | 15.000 |
| Jackson | .720 |
| RD & M: | |
| Cohen | 74.300 |
| CFWES & C: | |
| Walbolt | .400 |
| Bittick | 3.500 |
| TOTAL | 112.720 |

*Arnold & Porter's Hours:* The 417.4 hours spent by the attorneys from the law firm of Arnold & Porter—Mintz (135.250), Conley (146.000), Heim (59.000) and Louie (77.250)—cannot be counted toward the plaintiffs' successes. According to the plaintiffs, Arnold & Porter was retained to pursue the plaintiffs' ADA claim, and the

plaintiffs were not successful on this claim. Because the plaintiffs were able to point to nothing in their ADA claim that they could not have pursued under the 1986 consent decree, Arnold & Porter's work on the ADA claim cannot be counted towards the work the plaintiffs spent in opposing the defendants' efforts to be released from the 1986 consent decree. To be sure, the ADA's requirements, as they have developed over recent years, have in some significant aspects paralleled the requirements of the 1986 consent decree. *See Olmstead v. L.C. ex rel. Zimring,* — U.S. ——, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (Title II of the ADA requires states to place mentally disabled individuals in community placements rather than institutions where community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.) Thus an understanding of how courts have applied ADA law is arguably helpful in understanding how this court should apply the relevant requirements of the 1986 consent decree. The court therefore concludes that the plaintiffs' attorneys were justified in researching this law and bringing it to the court's attention. The plaintiffs were not justified, however, in retaining a battery of new lawyers to pursue this issue independently and solely.

*Bridge's Hours:* The defendants have taken issue with the 1,847.750 hours sought by Attorney Bridge. The plaintiffs

---

**24.** Of course, on occasion, the Eleventh Circuit has, after holding that a party is entitled to fees and expenses for appellate work, remanded to a trial court the matter of determining how much the party should receive in fees and expenses. This did not happen here, however.

**25.** The Eleventh Circuit gave no reason for denying the plaintiffs' fee request. That is a luxury district courts do not enjoy. *See*

*Barnes,* 168 F.3d at 435 (" 'Although a district court has wide discretion in performing these calculations,' *Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994), '[t]he [district] court's order on attorney[ ] fees must allow meaningful review—the district court must articulate the decisions it made, give principled reasons for those decisions, and show its calculation.' *Norman [ ],* 836 F.2d [at] 1304.").

have withdrawn 20.500 of these hours, and the court believes that this withdrawal adequately addresses the defendants' concern.

*Sumrall's Hours:* The court is deeply troubled by the submission of Attorney Sumrall, one of the plaintiffs' counsel. Her fee request for 1,242.100 hours reflects either a conscious effort to defraud or negligent attention to fee matters, both of which are inexcusable. Admittedly, the plaintiffs have now withdrawn 135.100 of her hours (which at $ 250 an hour total $ 33,775). However, the court is still left with considerable doubt about Sumrall's credibility on her remaining hours. Moreover, the court is troubled that the other attorneys for the plaintiffs, including the lead counsel in this litigation, Attorney Burnim, seem to have refused to investigate her fees in the face of substantial evidence that many of her requested hours were troubling. The plaintiffs appear to have blamed the defendants for having unearthed this apparent impropriety rather than blaming the one who engaged in the improper act. In other words, the plaintiffs are guilty of that for which the court has so often faulted the defendants: blaming the messenger rather than doing something about the problem. Finally, it cannot be overlooked that the actions of Sumrall, as well those of the plaintiffs' other attorneys, to the extent that they did nothing about the problem until they had to, has prolonged the litigation of the plaintiffs' fee-and-expense request. Under these circumstances and so as to take into account all factors, the court finds that Sumrall's remaining requested hours (1,107.000) should be reduced by 60% or 664.200 hours, with the result that her allowable hours are as follows: 1,242.100 − 799.300 (135.100 + 664.200) = 442.800.

With these deductions, the allowable hours are as follows:

| ATTORNEYS | GROSS HOURS | DISALLOWED HOURS | | NET HOURS |
|---|---|---|---|---|
| BAZELON CENTER: | | | | |
| Burnim | 2,587.600 − | 18.800 | = | 2,568.800 |
| Schlosberg | 2,830.120 − | 15.000 | = | 2,815.120 |
| Jackson | 1,659.550 − | 0.720 | = | 1,658.830 |
| Harris | 1,857.750 − | 0.000 | = | 1,857.750 |
| Bridge | 1,847.750 − | 20.500 | = | 1,827.250 |
| Giliberti | 849.600 − | 0.000 | = | 849.600 |
| RD & M: | | | | |
| Thompson | 55.500 − | 0.000 | = | 55.500 |
| Cohen | 511.200 − | 74.300 | = | 436.900 |
| Salovaara | 118.600 − | 0.000 | = | 118.600 |
| Mathis | 23.900 − | 0.000 | = | 23.900 |
| FWES & C: | | | | |
| Walbolt | 36.800 − | 0.400 | = | 36.400 |
| Bittick | 77.500 − | 3.500 | = | 74.000 |
| Adams | 1.300 − | 0.000 | = | 1.300 |
| ARNOLD & PORTER: | | | | |
| Mintz | 135.250 − | 135.250 | = | 0.000 |
| Conley | 146.000 − | 146.000 | = | 0.000 |
| Heim | 59.000 − | 59.000 | = | 0.000 |
| Louie | 77.250 − | 77.250 | = | 0.000 |
| OTHER ATTORNEYS: | | | | |
| Sumrall | 1,242.100 − | 799.300 | = | 442.800 |
| Singer | 475.671 − | 0.000 | = | 475.671 |
| Smith | 572.500 − | 0.000 | = | 572.500 |
| Tucker | 505.950 − | 0.000 | = | 505.950 |
| Eytan | 154.000 − | 0.000 | = | 154.000 |
| TOTALS | 15,824.891 − | 1,350.020 | = | 14,474.871 |

*Particularity Requirement:* The defendants further complain that the plaintiffs have failed to comply with the Eleventh Circuit's directive that a fee applicant should set out with sufficient particularity the general subject matter of the time expenditures so that the district court can assess the time claimed for each activity. *See Barnes,* 168 F.3d at 427. While a personal review of the plaintiffs' submission reflects that some of the plaintiffs' documentation is inadequate, and while it is true that the defendants have done a very good job of uncovering and noting these inadequacies, the plaintiffs' documentation is quite extensive and detailed. In addition, although persons could reasonably differ about the 'best' way to keep time records, and although it could be said in hindsight that the plaintiffs' attorneys could have set up a better record-keeping system, the court cannot in good faith say that the manner in which the plaintiffs have chosen to pursue their fee request was inadequate. On the whole, the current submissions have allowed the defendants and the court to engage in meaningful review of the plaintiffs' fee-and-expense request.

The court is further convinced, however, that the plaintiffs have not been adequately diligent in making sure that their submitted documentations and calculations were accurate, and, as a result, they have prolonged the litigation of fees and expenses. To account for this, the court will reduce each attorney's hours by 2 %, as follows: [26]

| ATTORNEYS | GROSS HOURS | | RATE | | NET HOURS |
|---|---|---|---|---|---|
| **BAZELON CENTER:** | | | | | |
| Burnim | 2,568.800 | × | 98% | = | 2,517.424 |
| Schlosberg | 2,815.120 | × | 98% | = | 2,758.818 |
| Jackson | 1,658.830 | × | 98% | = | 1,625.653 |
| Harris | 1,857.750 | × | 98% | = | 1,820.595 |
| Bridge | 1,827.250 | × | 98% | = | 1,790.705 |
| Giliberti | 849.600 | × | 98% | = | 832.608 |
| **RD & M:** | | | | | |
| Thompson | 55.500 | × | 98% | = | 54.390 |
| Cohen | 436.900 | × | 98% | = | 428.162 |
| Salovaara | 118.600 | × | 98% | = | 116.228 |
| Mathis | 23.900 | × | 98% | = | 23.422 |
| **CFWES & C:** | | | | | |
| Walbolt | 36.400 | × | 98% | = | 35.672 |
| Bittick | 74.000 | × | 98% | = | 72.520 |
| Adams | 1.300 | × | 98% | = | 1.274 |
| **OTHER ATTORNEYS:** | | | | | |
| Sumrall | 442.800 | × | 98% | = | 433.944 |
| Singer | 475.671 | × | 98% | = | 466.158 |
| Smith | 572.500 | × | 98% | = | 561.050 |
| Tucker | 505.950 | × | 98% | = | 495.831 |
| Eytan | 154.000 | × | 98% | = | 150.920 |
| TOTALS | 14,474.871 | × | 98% | = | 14,185.374 |

*Remaining Hours:* Finally, the defendants contend that these remaining 14,-185.374 hours are still exorbitant. The court does not agree. To repeat, the plaintiffs' overall success was two-fold and quite significant. First, they secured compliance with those *Wyatt* standards and other court-ordered requirements from which the court has so far released the defendants. And, second, they held the defendants' feet to the fire with regard to those standards from which the defendants have yet to be released. However, the court agrees with the defendants that these successes do not justify all the plaintiffs' hours. But beyond that, the court parts company with the defendants. In this regard, the court agrees with the plaintiffs that the defendants themselves are responsible for having unnecessarily prolonged this litigation and thereby having increased its overall cost. Fingering for all additional hours must point to the defendants only.

It would appear that, because, as stated, the plaintiffs and the defendants have a common goal in their post-judgment work (compliance with the judgment), application of the above *Hensley v. Eckerhart* standard—balancing the amount of effort against the plaintiffs' overall success—would be direct and easy. However, it is often true that the parties lose sight of, or never realize, the common goal they share in post-judgment proceedings, and, instead, they tend to revert back to their pre-judgment posture, with the parties posturing themselves as if one party can prevail only if the other party loses. Having reverted back, a party tends to view the other party's efforts as necessarily inconsistent with its own interest. When the parties revert back to their pre-judgment posture, they see the litigation as nothing more than a new chapter in their ongoing battle, and winning the battle, rather than obtaining compliance, becomes the goal, with the result that the litigation becomes an abstract test of each other's wills rather than a beneficial vindication and realization of real rights, and, with the result, unwitting or not, that the litigation is unnecessarily and greatly prolonged.

Regrettably, this unfortunate scenario has all too often played itself out before this court. As the orders of the court reflect—in particular, since 1990 and up until just before the appointment of the current Commissioner of Mental Health and Mental Retardation—the defendants have from time to time adopted a strategy

---

**26.** Because all Arnold & Porter's fees have been disallowed, the firm's members are not included in this chart.

of wilful non-cooperation; indeed, they have even been obstructionist at times. For example, in the wake of the filing of the defendants' motion for a finding that they had met their obligations under the 1986 consent decree and for an order terminating this lawsuit, the court, with the approval the parties, appointed Clarence Sundram to investigate and report to the court and parties the factual issues pertaining to the defendants' compliance with the outstanding orders of the court. The appointment was for the express purpose of facilitating a quick and inexpensive resolution of the lawsuit without discovery. The defendants, however, breached this agreement by hiring their own expert to replicate Sundram's work.

And then there were the seemingly intended efforts of the defendants to overwhelm the plaintiffs. The most noteworthy instance of this was when, on December 22, 1994, in the midst of heated and extensive preparations for trial by the parties and the court, the defendants unexpectedly filed a last-minute motion to decertify or modify the plaintiff class. They requested that the court and the parties redirect their limited time and energy to doing the following: appoint new class representatives and new class counsel; explicitly state who is in the class; clarify whether this class action is pursuant to subsection (b)(2) or (b)(3) of Rule 23 of the Federal Rules of Civil Procedure; permit members of the plaintiff class to opt out of the class pursuant to subsection (b)(3) of the rule if they wish; and issue notice to class members pursuant to subsection (d)(2) of the rule. And on January 18, 1995, after over 24 years of litigation, the defendants filed a supplemental motion adding an alternative request to decertify the plaintiff class. While, as the court noted in resolving these class-certification motions, the issues presented were "important" and "demanded immediate attention," the defendants' choice of time to file these mo-

tions was surely intended to disadvantage the plaintiffs unfairly and greatly; there is no reason why those motions could not have been filed earlier—indeed, years earlier. The late filing and the flurry of activity that attended it added unnecessary costs.

There were also efforts by the defendants to exploit the plaintiffs' difficult and complicated relationship with their clients. Obviously, in representing the plaintiff class here, plaintiffs' counsel have had to deal with the 'typical' problems that would attend a complex class action involving thousands of class members and scores of legal issues. But, as the court has further noted, because "plaintiffs' counsel cannot receive input from class members, he must seek it from such secondary sources as public interest organizations, former mental patients, and family members and caregivers who have day-to-day contact with class members in the state's institutions." *Wyatt v. Horsley*, 793 F.Supp. 1053 (M.D.Ala.1991) (Thompson, J.). Knowing this, the defendants had letters sent to plaintiff class members, their guardians, caregivers, and next-of-kin misleading them to believe that the plaintiffs were seeking to close down state mental health facilities and essentially leave the class members helpless. The defendants informed the plaintiffs that their attorneys were seeking reduction of services for all class members and full deinstitutionalization for the mentally-retarded, that is, to have all mentally-retarded class members now residing in the defendants' developmental centers moved into the community. The defendants failed to state in their letters that the plaintiffs advocate that the defendants be required to develop more extensive and greater community services and that institutionalized residents be given the *choice* between institutionalization and community placement. *Cf. Olmstead v. L.C. ex rel. Zimring*, —— U.S. ——, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (Title II of the ADA requires states to place mentally disabled individuals in community

placements rather than institutions where community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.) The defendants' conduct not only sought to put a wedge of distrust between plaintiffs and their clients, it actually did put a substantially larger wedge between counsel for plaintiffs and counsel for defendants, with the result that nonlitigious resolution of issues—and not only day-to-day discovery matters but substantive matters as well—became more and more difficult, if not impossible at times.

Frequently also, the defendants appeared to equate successful compliance with successful coverup. The most clear example of this was when, in 1995, the defendants' response to allegations of patient abuse at an adolescent facility was to deny the allegations without any investigation. Only after the court had openly questioned whether the defendants' denial-without-investigation was indicative of how they typically reacted to problems at the center, did the defendants conduct a serious inquiry into gang activity at the center. In a July 1995 opinion, the court explained then that "it was deeply disappointed that, rather than blanketly denying the allegations without their own investigation, they had not stood up and promised a personal and thorough investigation of their own and that, if the allegations proved true, there was nothing within reason the court could order that they would not have already done on their own to remedy the problem effectively." *Wyatt v. Poundstone*, 892 F.Supp. 1410, 1417 (M.D.Ala.1995) (Thompson, J.) [27].

And in its December 1997 final decision, the court echoed this viewpoint, noting that, while "[i]t would be impractical, and

thus unreasonable, to expect 100% compliance 100% of the time" with those court requirements covering patient abuse—for, after all, "the Alabama Department of Mental Health and Mental Retardation can act only through people who, though professional, are still fallible," *Wyatt v. Rogers*, 985 F.Supp. 1356, 1388 (M.D.Ala.1997) (Thompson, J.)—it is practicable to require of the defendants some reasonable assurance "that [they] have in place reasonable means for preventing such conditions to the extent practicable, and that they have in place reasonable means for uncovering and remedying the conditions when, unfortunately, they do arise." *Id.*[28] Unfortunately, the defendants have approached much of this case, and litigated it, as if they could succeed only if they could show the court and the public that they had absolutely no problems, and all too often that simply meant keeping from the plaintiffs and the court evidence of any serious problems, which tactic, when uncovered, had the unfortunate effect of re-enforcing past impressions that the defendants are unwilling to address serious problems.

Finally, while there were a number of good-faith disputes over discovery matters, there were also the months and months of overly and unnecessarily contentious discovery disputes; while some fault can be placed with the plaintiffs, most of the fault lies with the defendants. The plaintiffs had to turn repeatedly to this court for relief because of lack of cooperation from the defendants. Indeed, to the extent the plaintiffs were uncooperative in discovery, it was more often than not the result of understandable exasperation with, and lack of trust in, the defendants.

Therefore, the unfortunate fact that this litigation has been unnecessarily costly and extended must be laid at the feet of the defendants. Of the 15,824.891 hours requested by the plaintiffs, the court will

---

**27.** Doc. no. 1119.

**28.** Doc. no. 1568.

allow them to recover for the remaining 14,185.374.

### B. Prevailing Market Rates

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. To determine the prevailing market rate, the court will consider the following *Johnson* factors: customary fee; skills required to perform the legal services properly; the experience, reputation, and ability of the attorneys; time limitations; preclusion of other employment; undesirability of the case; nature and length of the professional relationship with the clients; fixed or contingent fee arrangement; and awards in similar cases. The plaintiffs' attorneys seek the following hourly rates for themselves:[29]

| ATTORNEYS | RATES |
| --- | --- |
| **BAZELON CENTER:** | |
| Burnim | $275 |
| Schlosberg | 250 |
| Jackson | 200 |
| Harris | 150 |
| Bridge | 140 |
| Giliberti | 140 |
| **RD & M:** | |
| Thompson | 260/280 |
| Cohen | 130/155 |
| Salovaara | 130 |
| Mathis | 135 |
| **CFWES & C:** | |
| Walbolt | 275 |
| Bittick | 165 |
| Adams | 95 |
| **OTHER ATTORNEYS:** | |
| Sumrall | 250 |
| Singer | 225 |
| Smith | 175 |
| Tucker | 175 |
| Eytan | 135 |

*Customary Fees:* "The customary fee for similar work in the community should be considered." *Johnson*, 488 F.2d at 718. The plaintiffs have submitted affidavits

making the general contention that fees in complex litigation cases such as the *Wyatt* litigation range from $ 100 to $ 400 an hour for attorneys practicing in Alabama and Washington, D.C., and that such fees are reasonable. The plaintiffs contend that the fees requested by the Bazelon Center staff attorneys and private attorneys in Alabama are consistent with rates set in comparable civil rights cases, and that the fees requested by the private attorneys in Washington, D.C. are the commercial rates charged by those firms to fee-paying clients. The court concludes on the basis of precedent and the evidence submitted by the parties that Alabama is the market the court will use in determining the rate of both in-state and out-of-state attorneys, *see Gay Lesbian Bisexual Alliance v. Sessions*, 930 F.Supp. 1492, 1496–97 (M.D.Ala.1996) (Thompson, J.) ("it is generally true that the 'rate of attorney's fees is that of the place where the case is filed' ") (quoting *Cullens v. Georgia Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir.1994)), and that the customary or usual billing rate for a civil rights case ranges from approximately $ 125 to approximately $ 350 per hour. *See Dillard v. Foley*, 995 F.Supp. 1358, 1373 (M.D.Ala.1998) (Thompson, J.) (determining, as of 1998, the customary or usual billing rate for civil rights cases, and voting rights cases in particular, to range from approximately $ 125 to approximately $ 350 per hour in certain cases; *see also Wyatt v. Hanan*, 1994 WL 1071682 (M.D.Ala.1994) (Thompson, J.) (acknowledging fee range of $ 75 to $ 200 in 1994);[30] and *Wyatt v. King*, 1991 WL 640065 (M.D.Ala.1991) (Thompson, J.) (same in 1991), *aff'd*, 985 F.2d 579 (11th Cir.1993) (table).

*Skill Required to Perform the Services Properly:* This litigation has from beginning to end posed a difficult and demanding task. A lawyer skilled in the complex and rapidly changing law of mental health was thus required. All of the plaintiffs'

---

**29.** *See infra* note 26.

**30.** Doc. no. 251.

attorneys met this standard. Attorney Burnim, however, because of his greater experience and ability, was of exceptional help in this litigation.

*Experience, Reputation, and Ability of the Attorneys:* All of the plaintiffs' attorneys are experienced and highly competent attorneys. They all also enjoy excellent reputations. The attorneys from the Bazelon Mental Health Center have been representing the plaintiff class for several years, and the lead counsel, Attorney Burnim, has been representing the plaintiffs since at least October 1982. The court has thus had a great deal of time and many opportunities to observe plaintiffs' attorneys and to assess their representation of the plaintiff class. It is no easy task to represent such a plaintiff class in a lawsuit that has been ongoing for so many years and in which there are multiple and complex legal issues. It is also quite difficult to represent a class of plaintiffs who are unlikely to be able to "voice" their interests themselves. *Wyatt v. Horsley,* 793 F.Supp. 1053, 1056 (M.D.Ala.1991). Yet, as this court has previously noted, counsel for the plaintiff class, Attorney Burnim, "is to be strongly commended for the sensitive and effective manner" in which he has represented the plaintiff class. *Id.* at 1062 n. 7.

*Time Limitations:* Where there has been "[p]riority work that delays the lawyer's other work," this factor requires "some premium." *Johnson,* 488 F.2d at 718. There is some evidence of this factor because of the demanding trial schedule and the large number of issues that had to be evaluated and presented in a short period of time.

*Preclusion of Other Employment:* This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson,* 488 F.2d at 718. The court finds that there is evidence of this factor in terms of the effect of the litigation on the Bazelon Center's resources and ability to take on other cases. Attorney Burnim's affidavit and supplemental response state that between December 1, 1993 and December 1, 1995, the Bazelon Center was unable to take on any "new systemic cases," as well as reduced its effort in several ongoing systemic cases and reduced its activities "as a national support center."

*Undesirability of the Case:* "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant.... Oftentimes his decision to · help eradicate discrimination is not pleasantly received by the community or his contemporaries." *Johnson,* 488 F.2d at 719. This case was not undesirable in this sense.

*Nature and Length of Relationship with Clients:* The Bazelon Center has been involved in this litigation for a number of years, and Attorney Burnim has represented the class since 1982. The law firm of Ross, Dixon & Masback has been involved in the litigation since 1991, and Carlton, Fields, Ward, Emmanuel, Smith & Cutler since 1996.

*Fixed or contingent fee:* "This factor focuses judicial scrutiny solely on the existence of any contract for fees that may have been executed between the party and his attorney." *Medders v. Autauga County Bd. of Educ.,* 858 F.Supp. 1118, 1127 (M.D.Ala.1994) (Thompson, J.) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. at 723, 107 S.Ct. at 3085). "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorneys' fee expectations when he accepted the case." *Johnson,* 488 F.2d at 718. Counsel for the plaintiffs had not fixed or contingent fee arrangement with the plaintiffs or the plaintiff class.

## 1354

*Awards in Similar Cases:* The court has awarded non-contingent fees in the range of $ 125 to $ 300 an hour in other civil rights cases in which its findings under the *Johnson* factors resemble those made in this case. *See Wyatt v. Hanan,* 1994 WL 1071682 (M.D.Ala.1994) (Thompson, J.) (awarding up to $ 225 an hour in mental-health case);[31] *Wyatt v. King,* 1991 WL 640065 (M.D.Ala.1991) (Thompson, J.) (same), *aff'd,* 985 F.2d 579 (11th Cir.1993) (table); *see also, e.g., Reynolds v. Alabama Dep't. of Transp.,* 926 F.Supp. 1448 (M.D.Ala.1995) (Thompson, J.) (civil rights case awarding attorneys fees at the rate of $ 225 an hour); *Medders v. Autauga Cty. Bd. of Educ.,* 858 F.Supp. 1118, 1128 (M.D.Ala.1994) (Thompson, J.) (awarding fees at the rate of $ 290 an hour); *Gay Lesbian Bisexual Alliance v. Sessions,* 930 F.Supp. 1492 (Thompson, J.) (gay and lesbian rights case awarding attorneys' fees at the rate of $ 225 and $ 200 an hour). Recently, Attorney Burnim was awarded a $ 250 an hour rate and Attorney Tucker was awarded a $ 175 an hour rate in *R.C. v. Nachman,* 992 F.Supp. 1328 (M.D.Ala. 1997) (DeMent, J.), a case involving constitutional violations in Alabama's child welfare system.

The court is of the opinion, based on these criteria, that the prevailing rates for non-contingent work performed by attorneys of similar experience in similar cases are as follows for the plaintiffs' attorneys:[32]

ATTORNEYS RATES

BAZELON CENTER:

| | |
|---|---|
| Burnim | $275 |
| Schlosberg | 225 |
| Jackson | 175 |
| Harris | 125 |
| Bridge | 125 |
| Giliberti | 125 |

RD & M:

| | |
|---|---|
| Thompson | 170 |
| Cohen | 170 |
| Salovaara | 120 |

| | |
|---|---|
| Mathis | 120 |

CFWES & C:

| | |
|---|---|
| Walbolt | 170 |
| Bittick | 130 |
| Adams | 95 |

OTHER ATTORNEYS:

| | |
|---|---|
| Sumrall | 170 |
| Singer | 170 |
| Smith | 170 |
| Tucker | 175 |
| Eytan | 120 |

These rates reflect the varying experience and abilities of the attorneys. The court recognizes that the $ 275 rate for Attorney Burnim is at the high end of the rates usually awarded by this court. Burnim, however, brings with him a reputation and experience in the area of mental health law that exceeds the usual for this court. Moreover, because of his expertise, he had been able to prosecute this case more efficiently. *Gay Lesbian Bisexual Alliance v. Sessions,* 930 F.Supp. 1492, 1496–97 (M.D.Ala.1996) (Thompson, J.) (attorneys' "expertise in gay and lesbian rights law, and [in] general civil rights expertise, enabled them to prosecute this case very efficiently. Attorneys with less knowledge and experience would have taken many more hours to pursue this litigation. Therefore, [attorneys'] efficiency justifies an hourly rate at the high end of the customary range."); *Dillard v. City of Elba,* 863 F.Supp. 1550, 1553 (M.D.Ala. 1993) (Thompson, J.) (experienced attorneys prosecuted case in fewer hours than inexperienced attorneys would have); *cf. Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 744 F.Supp. 1061, 1071 (M.D.Ala.1988) (Thompson, J.) (attorney's "inexperience should be reflected in [lower] ... hourly rate"), *aff'd,* 891 F.2d 842 (11th Cir.1990). Burnim's rate is appropriate for him.

Finally by establishing the appropriate market rates for all plaintiffs' attorneys on the basis of current rates, the court is also

---

**31.** Doc. no. 251.

**32.** *See infra* note 26.

compensating the plaintiffs for the delay in payment. *See Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989); *Norman,* 836 F.2d at 1302.

### C. Lodestar Calculations

The unadjusted lodestar figure for each attorney consists of the product of the attorney's compensable hours times the prevailing market fee. The lodestar figure for each of the attorneys, followed by the total fee award for the plaintiffs' attorneys, is as follows: [33]

| ATTORNEYS | GROSS HOURS | RATES | | SUBTOTALS |
|---|---|---|---|---|
| BAZELON CENTER: | | | | |
| Burnim | 2,517.424 × | $275 | = | $ 692,291.60 |
| Schlosberg | 2,758.818 × | 225 | = | 620,734.05 |
| Jackson | 1,625.653 × | 175 | = | 284,489.28 |
| Harris | 1,820.595 × | 125 | = | 227,574.38 |
| Bridge | 1,790.705 × | 125 | = | 223,838.13 |
| Giliberti | 832.608 × | 125 | = | 104,076.00 |
| | | | | |
| RD & M: | | | | |
| Thompson | 54.390 × | 170 | = | 9,246.30 |
| Cohen | 428.162 × | 120 | = | 51,379.44 |
| Salovaara | 116.228 × | 120 | = | 13,947.36 |
| Mathis | 23.422 × | 120 | = | 2,810.64 |
| | | | | |
| CFWES & C: | | | | |
| Walbolt | 35.672 × | 170 | = | 6,064.24 |
| Bittick | 72.520 × | 130 | = | 9,427.60 |
| Adams | 1.274 × | 95 | = | 121.03 |
| | | | | |
| OTHER ATTORNEYS: | | | | |
| Sumrall | 433.944 × | 170 | = | 73,770.48 |
| Singer | 466.158 × | 170 | = | 79,246.86 |
| Smith | 561.050 × | 170 | = | 95,378.50 |
| Tucker | 495.831 × | 175 | = | 86,770.43 |
| Eytan | 150.920 × | 120 | = | 18,110.40 |
| | | | | |
| TOTALS | | | | 2,599,276.72 |

The court has therefore reduced the plaintiffs' fee request from $ 3,256,259.73 to $ 2,599,276.61.

### D. Adjustments

■ "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Although the plaintiffs were substantially and significantly successful and although they faced particularly recalcitrant defendants, the court does not believe that an adjustment upward is warranted. The fee awarded today adequately compensates the plaintiffs for these factors. A downward adjustment is not warranted either.

■ Finally, the court recognizes that, in applying the *Johnson* factors, it is possible to be so focused on the aspects of a picture that you miss the big picture itself. A court's duty in determining reasonable fees is not simply to recite the *Johnson* factors, plug in the data, and spit out the result. The total amount awarded must still bear some overall reasonable relationship with the result obtained by the prevailing party. Here, as stated, the plaintiffs were significantly and substantially successful: first, they secured compliance with those *Wyatt* standards and other court-ordered requirements from which the court has so far released the defendants; and, second, they held the defendants' feet to the fire with regard to those standards from which the defendants have yet to be released. In addition, the plaintiffs faced very recalcitrant defendants. The court believes that these circumstances bear an overall reasonable relationship with the $ 2,599,276.61 fee awarded.

### E. Reasonable Expenses

■ The plaintiffs seek $ 550,081.05 for expenses incurred in connection with the litigation. With the exception of routine overhead office expenses normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation or as an aspect of settlement of the case, may be taxed as costs; the standard of reasonableness is to be given a liberal interpretation. *See Loranger v. Stierheim,* 3 F.3d 356, 363 (11th Cir.1993); *NAACP v. City of Evergreen,* 812 F.2d 1332, 1337 (11th Cir.1987); *Dowdell v. City of Apopka,* 698 F.2d 1181,

**33.** *See infra* note 26.

1192 (11th Cir.1983). This request may be broken down as follows:

| | |
|---|---|
| Travel | $ 75,193.53 |
| Photocopying | 110,061.64 |
| Telephone | 16,228.67 |
| Experts | 84,549.30 |
| Depositions | 33,352.20 |
| Other | $230,695.71 |
| | |
| TOTAL | $550,081.05 |

The court will disallow some of these.

*Travel Expenses:* The court is of the view that the plaintiffs' travel expenses are exorbitant; they are not justified in full— in particular, the trips back and forth from distant cities to Montgomery, Alabama, the site of the litigation. These expenses will therefore be reduced by $ 20,000.00.

*Photocopying Expenses:* The plaintiffs' copying request is extremely large. In addition, while the discovery in this case required the production of rooms of documents, the court is troubled that the plaintiffs have not adequately explained in many instances why each bulk of large copying was necessary. As the payers of the bill, the defendants are entitled to such. These expenses will therefore be reduced by $ 20,000.00.

■ *Expert Fees:* In *West Va. Univ. Hospitals v. Casey,* 499 U.S. 83, 101, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991), the Supreme Court held that a plaintiff could not recover expert witness fees under § 1988 in excess of the per diem attendance fees set forth in 28 U.S.C.A. § 1821(b), as provided by 28 U.S.C.A. § 1920. The Court refused to permit such

shifting of expert fees and expenses in the absence of language indicating that Congress intended to shift 'expert witness fees' or 'reasonable litigation expenses,' as it had done in other contemporaneous statutes. *Id.* After the Supreme Court's decision in *Casey,* Congress amended § 1988 to specifically permit the recovery of expert fees. *See* 42 U.S.C.A. § 1988(c). However, that provision is expressly limited to actions brought pursuant to 42 U.S.C.A. § 1981 or 42 U.S.C.A. § 1981a, and here the plaintiffs do not rely on these provisions.[34] *See id.*

The plaintiffs point alternatively to a statement by the district court in *Halderman v. Pennhurst State School and Hospital,* 855 F.Supp. 733, 745 (E.D.Pa.1994), that, notwithstanding § 1988, the trial court "has the inherent equitable power in this case to award expert fees." Context, as this court noted earlier, is usually critical, and the plaintiffs here fail to give proper credit to the context of the *Pennhurst* court's statement. The *Pennhurst* trial court found that, "The underlying litigation was a civil contempt action in which the defendants were found to be in deliberate and willful contempt of an order of this Court." *Id.* The court explained that, "Prevailing plaintiffs in contempt actions are entitled to recover the entire cost of bringing the contempt action." *Id.* In making these observations, the *Pennhurst* court relied on the case of *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), in which the Su-

---

**34.** Section 1988 provides in part as follows:
"(b) Attorney's fees
In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action

brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.
"(c) Expert fees
In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee."

preme Court stated that, "a court's 'inherent power' to impose sanctions for contempt is 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases,'" *id.* at 43, 111 S.Ct. at 2132, and "Thus, 'if in its informed discretion, neither the statute nor the rules are up to the task, the court may safely rely on its inherent power.'" *Id.* at 50, 111 S.Ct. at 2136. In upholding the *Pennhurst* court's decision in part, the Third Circuit Court of Appeals stated "that granting reimbursement fees of [expert witnesses] would be proper in a contempt action." *Halderman v. Pennhurst State School and Hospital,* 49 F.3d 939, 943 (1995). In the contempt setting, the "innocent party is entitled to be made whole for the losses it incurs as the result of the contemnors' violations, including reasonable attorneys' fees and expenses." *Id.* at 941.

Here, the plaintiffs neither sought *civil contempt* nor was there a finding of such. The plaintiffs' reliance on the *Pennhurst* cases is wholly misplaced.[35] The court will disallow the plaintiffs' entire $ 84,549.30 request, but will allow their alternative request of $ 6,295.84 for the per diem attendance expenses of their experts. Thus, the court will deduct from the plaintiffs' expense request the difference of $ 78,253.46 ($ 84,549.30 − $ 6,295.84).

A plaintiff who seeks to challenge whether there has been compliance with a final judgment but who lacks the financial resources to retain a needed expert is not necessarily without recourse, however. The plaintiff may always petition the court to retain its own expert pursuant to Rule 706(a) of the Federal Rules of Evidence to review the defendant's conduct.[36]

*Appellate Expenses:* For the same reason, given above by the court, that the plaintiffs' counsel cannot recover appellate fees incurred in pursuit of appellate fees and expenses, they cannot recover appellate expenses incurred in pursuit of appellate fees and expenses. The expenses, which will be disallowed, are as follows:

| | |
|---|---|
| BAZELON CENTER | $ 40.00 |
| RD & M | 200.00 |
| CFWES & C | 50.00 |
| TOTAL | $290.00 |

*Arnold & Porter's Expenses:* For the same reason the court gave that Arnold & Porter could not recover fees, the firm cannot recover its expenses. The court will therefore disallow the firm's expenses of $ 18,496.70.

*Other Expenses:* The Bazelon Center attorneys cannot recover $ 3,923.17 for office supplies and $ 1,886.00 for leasing a copying machine. The court will therefore disallow $ 5,809.17.

*Sumrall's Expenses:* Sumrall seeks expenses of $ 1,699.00 for travel and $ 15,708.00 for her paralegal, for a total of $ 17,407.00. For the reasons already given, the court will reduce her expenses by 60 % or $ 10,444.20.

The court will, in sum, disallow the following expenses:

---

**35.** Indeed, the plaintiffs' reliance on the *Pennhurst* cases is so obviously misplaced that the court is baffled as to why they made this argument. It is as if they were inviting the court to commit clear error. If any one should know that there is a difference between contempt and non-contempt proceedings and that the recent proceedings in this case are *not* the former, they are this trial court and parties to this litigation. *See Wyatt v. Rogers,* 92 F.3d at 1078 n. 8.

**36.** In addition, this court, as do many other courts, has funds, albeit very limited ones, available to help defray the expenses of indigent parties. *See Doe v. Pryor,* 61 F.Supp.2d 1235 (M.D.Ala.1999) (Thompson, J.).

| | |
|---|---|
| Travel | $ 20,000.00 |
| Photocopying | 20,000.00 |
| Experts | 78,253.46 |
| Appellate Work | 290.00 |
| Arnold and Porter | 18,496.70 |
| Bazelon Center | 5,809.17 |
| Sumrall | $ 10,444.20 |
| **TOTAL** | **$153,293.53** |

The court will allow the plaintiffs to recover the remaining sum of $ 396,787.52 ($ 550,081.05 less $ 153,293.53). The court finds that these expenses, which include expenses for paralegal and legal associates, were needed and are reasonable. The court finds that the work done by the plaintiffs' paralegals and legal associates was for work traditionally done by attorneys and that the paralegals and legal associates' hourly rates of $ 60 to $ 85 an hour are reasonable. *See Reynolds v. Alabama Dep't of Transp.*, 926 F.Supp. 1448, 1456 (M.D.Ala.1995) (Thompson, J.).

## IV. CONCLUSION

The court finds that the plaintiffs may recover total sum of $ 2,996,064.24, as follows:

| | |
|---|---|
| Fees | $2,599,276.72 |
| Expenses | 396,787.52 |
| **TOTAL** | **$2,996,064.24** |

In reaching this conclusion, the court has had to wade through numerous filings from the both the plaintiffs and the defendants; the dispute over the plaintiffs' fees and expenses has been more time consuming and complex for the court than the average piece of civil litigation. And a contributing factor, as discussed above, has been the considerable dislike shown by the plaintiffs for the aggressive manner in which the defendants have pursued the dispute. While the parties and the court should in general avoid turning a fee-and-expense dispute into a major round of litigation, it cannot be overlooked that the defendants here were confronted with a $ 3.8 million request. The defendants therefore acted reasonably in hesitating to pay out this sum without being reasonably sure that the amount is justified; they acted reasonably in demanding that the plaintiffs justify their request in some detail. Indeed, because of the aggressive manner in which this fee-and-expense issue has been litigated, the court has high confidence that the sum awarded today is reasonable.

Finally, in justifying the award made today, the court has, in part, faulted the defendants for the manner in which they have pursued this litigation on the merits. The court has recounted how the defendants are themselves responsible for unnecessarily prolonging this litigation and increasing its costs. Fortunately, it appears that, with the advent this year of Kathy E. Sawyer as Commissioner of Mental Health and Mental Retardation, the posture of this litigation will change dramatically. Commissioner Sawyer has made clear that all problems will be "aired" and that all will be directly and forcefully addressed. Therefore, it appears now within sight that, under the leadership of Commissioner Sawyer, this litigation will come to an end in the near future, and certainly within her stint as Commissioner.

An appropriate and separate order will be entered.

## ORDER

Currently before the court is Honorable Kathryn H. Sumrall's motion to alter or amend, filed October 15, 1999 (Doc. no.1961), through which she seeks to have the attorneys' fees—totaling $73,770.48—awarded to her by this court's order of October 7, 1999 (Doc. no.1954), paid directly to the Corporate Foundation for Children, a charity that serves child victims of abuse and neglect.

In support of her motion, Sumrall states that she found the court's suggestion that her fee petition was not submitted in good faith "deeply troubling." She describes her prior experience in advocacy for mentally-ill youths, and her motivations for participating in this lawsuit. She writes:

"One cannot question the dedication, passion and commitment this attorney brought to these proceedings. The concern of the undersigned for the children in mental health facilities in this State cannot be questioned. For this reason, the Court's language and inference was especially painful to me."

Through these heartfelt representations, Ms. Sumrall has convinced the court that she had no intention to defraud anyone or to misrepresent her fees. The court commends her for her involvement in this litigation, and for her decision to donate her fees to a children's charity.

For these reasons and because none of the parties has raised objections to the motion, it is ORDERED that Honorable Kathryn H. Sumrall's motion to alter or amend, filed October 15, 1999 (Doc. no.1961), is granted.